See also 532 F.Supp. 881.

**Marie Lucie JEAN, et al., Plaintiffs,**

**Lucien Louis, et al.,
Plaintiffs-Appellees-Cross-Appellants,**

**State of Florida, Intervenor-Appellant,**

v.

**Alan C. NELSON, et al.,
Defendants-Appellants-Cross-Appellees.**

No. 82–5772.

United States Court of Appeals,
Eleventh Circuit.

Feb. 28, 1984.

Rehearing and Rehearing En Banc
Denied May 4, 1984.

Stanley Marcus, U.S. Atty., Sonia O'Donnell, Asst. U.S. Atty., Miami, Fla., Leon B. Kellner, New York City, Robert L. Bombaugh, Rudolph W. Giuliani, Associate Atty. Gen., Barbara L. Herwig, Michael Jay Singer, Appellate Staff, Civ.Div., Dept. of Justice, Washington, D.C., Nade E. Strickland, Crim. Investigator, U.S. INS, Dept. of Justice, Atlanta, Ga., for defendants-appellants-cross-appellees.

Ira J. Kurzban, Christopher Keith Hall, Kurzban, Kurzban & Weinger, National Emergency Civil Liberties Committee and Haitian Refugee Center, Inc., Miami, Fla., Bruce J. Winick, ACLU Foundation of Fla., Coral Gables, Fla., Michael Rosen, ACLU Foundation of Fla., Miami, Fla., Irwin P. Stotzky, University of Miami, School of Law, Coral Gables, Fla., Vera Weisz, Los Angeles, Cal., Mary B. Gilmore, Terrence A. Corrigan, Marla Simpson, Robert E. Jucean, New York City, for plaintiffs-appellees-cross-appellants.

J. Kendrick Tucker, Deputy Atty. Gen., Tallahassee, Fla., for intervenor State of Fla.

Dan Paul, Paul & Thomson, Steven M. Kamp, Miami, Fla., for amicus American Immigration Lawyers Ass'n.

Arthur C. Helton, Lawyers Committee for Intern. Human Rights, Richard Simpson, Elise A. Bloustein, Robert L. Weigel, Philip S. Weber, New York City, for amicus Immigration Law Clinic of Columbia University School of Law and Lawyers Committee for Intern. Human Rights.

VANCE, Circuit Judge:

This case presents complex and fundamental constitutional questions concerning the rights of excludable or unadmitted aliens [1] and the authority of the Executive branch over immigration matters. It arises out of a class action brought on behalf of Haitian aliens who arrived in the Southern District of Florida on or after May 20, 1981 and were detained at various facilities of the Immigration and Naturalization Service (INS) pending a final determination of the merits of their petitions for asylum.[2]

Plaintiffs allege that their incarceration was improper for two reasons. First, they contend that the government improperly failed to comply with the notice and comment provisions of the Administrative Procedure Act (APA) when it adopted a new practice of detaining aliens who could not establish a prima facie claim of admission to this country, rather than paroling them pending a hearing on their petitions for admission to asylum. Second, plaintiffs assert that the new detention policy is illegal because it is discriminatory either on its face or in its application, since Haitian aliens appear to be disproportionately affected by the new policy.

The district court concluded that the policy had not been applied in a discriminatory manner, but ruled that the government had failed to comply with the requirements of the APA and ordered the release of the detained class members. *Louis v. Nelson [Louis III],* 544 F.Supp. 973 (S.D.Fla.1982). A panel of this court subsequently affirmed the district court's decision with regard to the requirements of the APA, but found

1. In this opinion aliens who have reached our border but have not formally been admitted to the United States are described as "excludable" or "unadmitted" aliens. These terms should be understood as synonymous with "non-resident" or "excluded" aliens and "aliens denied entry." Aliens who have succeeded in effecting an "entry in contemplation of law" are described as "deportable" or "resident" aliens. These terms can apply both to aliens who have been permitted to enter by immigration officials and to those who have succeeded in entering this country illegally. We will use the term "exclusion" to refer to the process of excluding and deporting an excludable alien, and "deportation" to describe the process of expelling and deporting a resident alien.

Although "deportation" and "expulsion" technically refer only to the required departure of a resident alien, they are sometimes used informally by the courts to refer to any removal of an alien from this country, regardless of status. When used in this manner, however, it should be understood that these terms "reflect[ ] none of the technical gloss accompanying [their] use as ... word[s] of art" in the sections of the immigration laws referring to

the removal of resident aliens. *Leng May Ma v. Barber,* 357 U.S. 185, 187, 78 S.Ct. 1072, 1073, 2 L.Ed.2d 1246 (1958). For one commentator's attempt to parse out this terminological confusion, see Comment, *Deportation and Exclusion: A Continuing Dialogue Between Congress and the Courts,* 71 Yale L.J. 760, 761 n. 8 (1962).

2. The class certified by the district court comprises:

All Haitian aliens who have arrived in the Southern District of Florida on or after May 20, 1981, who are applying for entry into the United States and also are presently in detention pending exclusion proceedings at various INS detention facilities, for whom an order of exclusion has not been entered and who are either:

1) Unrepresented by counsel; or

2) Represented by counsel pro bono publico assigned by the Haitian Refugee Volunteer Lawyer Task Force of the Dade County Bar Association.

*Louis v. Nelson [Louis III],* 544 F.Supp. 973, 984 (S.D.Fla.1982).

that the district court had erred in holding that plaintiffs had failed to demonstrate that the government's actions were the product of discriminatory intent. *Jean v. Nelson,* 711 F.2d 1455, *reh'g en banc granted,* 714 F.2d 96 (11th Cir.1983). We now reverse and remand for further findings by the district court. Because the facts of this case have been extensively set forth in the opinions of the panel and the district court, we proceed directly to a discussion of the legal questions involved.

## I. COMPLIANCE WITH THE ADMINISTRATIVE PROCEDURE ACT

Count Two of plaintiffs' complaint asserted that the new detention policy adopted by the Administration in the summer of 1981 constituted a "rule" within the meaning of the Administrative Procedure Act (APA), *see* 5 U.S.C. § 551(4), and that the government's failure to comply with the rulemaking procedures of the APA rendered the plan void and unenforceable. An administrative agency generally cannot adopt a substantive rule without first publishing notice of the proposed regulation and providing interested parties with an opportunity to comment. *Id.* § 553(b), (c). The government conceded that it had not followed these procedures when it adopted the new detention policy, but argued that it was exempt from these requirements on the grounds that the new approach was not a "rule" within the meaning of the APA. Alternatively, the government argued that even if the new detention program did constitute a rule, it fell within the foreign affairs, interpretative rules, and general statements of agency policy exceptions to the APA's rulemaking requirements. *See id.* § 553(a)(1), (b)(A) & (B). The district court rejected these arguments. *Louis III,* 544 F.Supp. at 997. It ordered the government to parole the class members then detained and enjoined the government from enforcing its new detention program until the INS complied with the rulemaking procedures of the APA. *Louis v. Nelson [Louis IV],* 544 F.Supp. 1004, 1006 (S.D.Fla.1982).

After the district court rendered its decision, the government promulgated new regulations in accordance with the APA. *See* 8 C.F.R. § 212.5 (1982). At oral argument before this court counsel for petitioners stated that one hundred or more class members are currently being held in detention, but these detainees either had their parole revoked for failure to comply with the terms of the district court's order, *see Louis IV,* 544 F.Supp. at 1009, or arrived in this country after the government's promulgation of its new regulations. Because the government is no longer detaining any class members except pursuant to the new regulations, the APA issue as originally presented has been rendered moot. The validity of these new regulations is not before this court, and we express no opinion in this regard. We accordingly dismiss the appeal as to Count Two of plaintiffs' complaint and remand with instructions that this part of the district court's judgment be vacated.

## II. THE EQUAL PROTECTION CLAIM

The central question raised by this case in its present posture is whether the Haitian plaintiffs may invoke the equal protection guarantee of the fifth amendment's due process clause as a basis for challenging the government's refusal to grant them parole. The district court, reasoning that "the [Supreme] Court has never held [that] 'the Constitutional guarantees of the Fifth Amendment do not apply to unadmitted aliens,'" *Louis III,* 544 F.Supp. at 998, decided that it could reach the merits of the Haitians' claim that the government's new restrictive parole policy was being applied in a discriminatory manner. The lower court noted that a string of Supreme Court decisions beginning with *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886) have recognized that aliens are "persons" for the purposes of the fifth and fourteenth amendments and concluded that "[p]laintiffs are entitled to the same constitutional protections afforded all persons within the territorial jurisdiction of the United States." *Louis III,* 544 F.Supp. at 998; *see also Jean,* 711 F.2d at 1484. The district court conceded that the Supreme

Court has repeatedly stressed that excludable aliens have no constitutional rights with respect to their applications for admission into this country, but it distinguished this case on the grounds that "the[ ] claim before this Court does not relate to admission and does not challenge Congress' power in that regard. Plaintiffs' claim is that they cannot be denied parole, pending a determination of their admissibility, because of their race and/or national origin." *Louis III,* 544 F.Supp. at 998; *see also Jean,* 711 F.2d at 1484–85.

The lower court also emphasized that while prior Supreme Court decisions have recognized that there are few if any limitations on Congress' power to formulate guidelines and procedures governing the exclusion of unadmitted aliens, even excludable aliens must receive from the Executive whatever degree of due process protection has been authorized by Congress. Thus, the district court held that if Congress intended the statutes under which the INS acted to be applied neutrally to all excludable aliens, the judiciary could review the Haitian plaintiffs' claim that executive officials violated their fifth amendment rights to due process and equal protection by exercising their discretionary parole authority in a discriminatory manner. *Louis III,* 544 F.Supp. at 998–99; *see also Jean,* 711 F.2d at 1485.

The district court therefore stressed that this case involves a challenge to detention, rather than admission. The court below also drew a sharp distinction between the actions of the legislative and the executive branches, asserting that while Congress is free to discriminate in adopting policies

that govern the admission or the processing of excludable aliens, the Executive is prohibited from doing so in the absence of an express congressional mandate. We conclude, however, that the lower court's reasoning is flawed with regard to both points. It is our view that the decision to parole or detain an excludable alien is an integral part of the admissions process and that the grant of discretionary authority to the Attorney General under 8 U.S.C. § 1182(d)(5)(A) permits the Executive to discriminate on the basis of national origin in making parole decisions.

The Executive, however, apparently contends that its parole policy does not discriminate on the basis of national origin,[3] and the new regulations adopted by the INS during the pendency of this suit utilize facially neutral criteria. *See* 8 C.F.R. § 212.5. The question that the district court must therefore consider with regard to the remaining Haitian detainees is thus not whether high-level executive branch officials such as the Attorney General have the discretionary authority under the Immigration and Nationality Act (INA) to discriminate between classes of aliens, but whether lower-level INS officials have abused their discretion by discriminating on the basis of national origin in violation of facially neutral instructions from their superiors. *See Bertrand v. Sava,* 684 F.2d 204, 212 n. 12 (2d Cir.1982). We remand to the district court for reconsideration of this issue in light of this opinion.

### A. Immigration and the Authority of the Political Branches

Every nation has the right to refuse to admit a foreigner into the country. . . .

---

**3.** Neither the President's statement of July 30, 1981, nor the Attorney General's testimony before Congress that same day discussed the Administration's new detention policy in any detail. The President spoke only in general terms about the need to "establish control over immigration" and to ensure that foreigners are admitted into this country "in a controlled and orderly fashion." The Attorney General discussed "the necessity of detaining illegal aliens pending exclusion" and noted that "[b]y treating those who arrive by sea in the same way we have long treated those who arrive over our land borders, our policy will be evenhanded. . . ." *Hearing Before the Senate Subcomm.*

*on Immigration and Refugee Policy and the House Subcomm. on Immigration, Refugees, and International Law,* 97th Cong., 1st Sess. 14–15 (1981) (statement of William French Smith, Attorney General) [hereinafter cited as *Hearing*]. Although some of the initiatives announced by the President and Attorney General addressed the problem of Haitian immigration—for example, the President's decision to order the Coast Guard to interdict vessels suspected of carrying undocumented aliens on the high seas, Exec. Order No. 12,324 (1981), *reprinted in* 8 U.S.C.A. § 1182 note at 71—none of these policies is at issue in this litigation.

What it owes to itself, the care of its own safety, gives it this right; and, in virtue of its natural liberty, it belongs to the nation to judge whether its circumstances will or will not justify the admission of the foreigner.

Emmerich de Vattel, *The Law of Nations* (1758).

■ For centuries, it has been an accepted maxim of international law that the power to control the admission of foreigners is an inherent attribute of national sovereignty. *Fong Yue Ting v. United States,* 149 U.S. 698, 707–11, 13 S.Ct. 1016, 1019–21, 37 L.Ed. 905 (1893); *Nishimura Ekiu v. United States,* 142 U.S. 651, 659, 12 S.Ct. 336, 338, 35 L.Ed. 1146 (1892).[4] Although the Constitution contains no direct mandate relating to immigration matters, the Supreme Court has long recognized that the political branches of the federal government have plenary authority to establish and implement substantive and procedural rules governing the admission of aliens to this country. *Id.; Chae Chan Ping v. United States [The Chinese Exclusion Case],* 130 U.S. 581, 609, 9 S.Ct. 623, 631, 32 L.Ed. 1068 (1889). It is worth emphasizing that while the Court could have implied the power to regulate immigration from constitutional grants of legislative powers such as the right to declare war, to approve treaties, to regulate foreign commerce, to establish a uniform rule of naturalization, and to enact all necessary and proper laws, the Court instead declared that "the control of immigration [is] an implied power arising out of national sovereignty and existing without regard to any constitutional grant." 1 C. Gordon & H. Rosenfield, *Immigration Law and Procedure* § 2.2a (rev. 1982); *cf. United States v. Curtiss-Wright Export Corp.,* 299 U.S. 304, 318, 57 S.Ct. 216, 220, 81 L.Ed. 255 (1936) ("[T]he investment of the federal government with the powers of external sovereignty did not depend upon the affirmative grants of the Constitution.").[5]

**4.** Some courts and commentators have argued that since the Supreme Court in *Nishimura Ekiu* sought support for its expansive definition of the exclusion power in traditional international law concepts, subsequent developments in international law should affect the scope of the exclusion power. *See, e.g., Rodriguez-Fernandez v. Wilkinson,* 654 F.2d 1382, 1388 (10th Cir.1981) (dictum); Note, *Constitutional Limits on the Power to Exclude Aliens,* 82 Colum.L. Rev. 957, 969 n. 88 (1982). Amici urge us to adopt that position here and find that the continued detention of the Haitian plaintiffs violates the prohibition against arbitrary and indefinite punishment recognized in a number of international agreements. *See, e.g.,* Universal Declaration of Human Rights, Art. 3 ("everyone has the right to life, liberty, and the security of person") and Art. 9 ("no one shall be subjected to arbitrary arrest, detention or exile"), U.N. Doc. A/801 (1948); The American Convention on Human Rights, Part I, ch. II, Art. 7(3) ("No one shall be subject to arbitrary arrest or imprisonment."), 77 Dept. of State Bull. 28 (July 4, 1977); *see also Rodriguez-Fernandez,* 654 F.2d at 1388.

The fact that the United States is a signatory to the latter document but not the former does not affect amici's argument, since they do not assert claims founded on any self-executing source of international law, but simply contend that these agreements represent part of the modern background of international law against which the dimensions of the exclusion power must be defined. Customary interna-

tional law, however, derives not only from individual treaties, but from the "concordant and recurring action of numerous States in the domain of international relations, the conception in each case that such action was enjoined by law, and the failure of other States to challenge that conception at the time." Hudson, *The Permanent Court of International Justice, 1920–1942* 609 (1943), *quoted in* 1 M. Whiteman, *Digest of International Law* § 6, at 75 (1963). "Arbitrary" is hardly a self-defining term, but amici have pointed to no evidence in the way of diplomatic protests, international arbitrations, or court decisions that suggest that it is current international practice to regard the detention of uninvited aliens seeking admission as a violation of customary international law. We therefore see no reason for concluding that the traditional conceptions of national sovereignty relied on by the Supreme Court in its early decisions in this area have been significantly eroded, and we note that this view is in accord with the Court's own recent pronouncements. *See, e.g., Landon v. Plasencia,* 459 U.S. 21, 32, 103 S.Ct. 321, 329, 74 L.Ed.2d 21 (1982) ("[T]he power to admit or exclude aliens is a sovereign prerogative.").

**5.** Because this "undefined and undefinable" sovereign power does not depend on any constitutional grant of authority, there are apparently no limitations on the power of the federal government to determine what classes of aliens will be permitted to enter the United States or what procedures will be used to determine their

The political branches of the federal government therefore possess concurrent authority over immigration matters. *See Fong Yue Ting,* 149 U.S. at 713, 13 S.Ct. at 1022; *Nishimura Ekiu,* 142 U.S. at 659, 12 S.Ct. at 338. Congress may exercise its implied powers in the immigration field through its legislative powers, while the Executive has two sources of authority in this area: (1) power delegated by Congress through statutes such as the INA and (2) its inherent power, arising out of the Executive's plenary authority over foreign relations. *United States ex rel. Knauff v. Shaughnessy,* 338 U.S. 537, 542, 70 S.Ct. 309, 312, 94 L.Ed. 317 (1950). Theoretically, the President has an independent source of power concerning immigration policy, at least with regard to matters that are not the subject of either a statutory mandate or an express prohibition.[6] *See Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 636–37, 72 S.Ct. 863, 870–71, 96 L.Ed. 1153 (1952) (Jackson, J., concurring); *Olegario v. United States,* 629 F.2d 204, 226 (2d Cir. 1980), *cert. denied,* 450 U.S. 980, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981). In practice, however, the comprehensive character of the INA vastly restricts the area of potential executive freedom of action, and the courts have repeatedly emphasized that the responsibility for regulating the admission of aliens resides in the first instance with Congress. *See, e.g., Knauff,* 338 U.S. at 543, 70 S.Ct. at 312; *Fong Yue Ting,* 149 U.S. at 713, 13 S.Ct. at 1022; *Nishimura Ekiu,* 142 U.S. at 659, 12 S.Ct. at 338; *Palma v. Verdeyen,* 676 F.2d 100, 103 (4th Cir.1982). The courts have instead tended to view the President's inherent powers as a justification for permitting Congress to make remarkably broad delegations of its authority in the immigration field. As Justice Minton explained in *Knauff,* "[n]ormally Congress supplies the conditions of the privilege of entry into the United States. But because the power of exclusion of aliens is also inherent in the executive department of the sovereign, Congress may in broad terms authorize the executive to exercise the power" without raising delegation concerns. 338 U.S. at 543, 70 S.Ct. at 313; *cf. Zemel v. Rusk,* 381 U.S. 1, 17, 85 S.Ct. 1271, 1281, 14 L.Ed.2d 179 (1965); *Curtiss-Wright,* 299 U.S. at 320, 57 S.Ct. at 221 (when dealing with foreign affairs Congress may delegate a degree of discretion that would not be permissible if domestic policy alone were involved).

The sweeping delegations of congressional authority contained in the INA demonstrate that Congress has taken full advantage of the Supreme Court's invitation. The principal responsibility for immigration matters in the Executive branch resides with the Attorney General, who is the beneficiary of broad grants of discretion under the statute. The most important of these is set forth at 8 U.S.C. § 1103(a), which provides that:

> The Attorney General shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens, except insofar as [power is delegated to other executive officials]....

admissibility. *See, e.g., The Chinese Exclusion Case,* 130 U.S. at 609, 9 S.Ct. at 631; 1 C. Gordon & H. Rosenfield, *supra,* at § 2.2a; *cf. Wong Wing v. United States,* 163 U.S. 228, 237, 16 S.Ct. 977, 980, 41 L.Ed. 140 (1896) (noting that powers of the federal government with regard to aliens are more limited outside the immediate context of regulating entry). Aliens may therefore be denied admission on grounds that would be constitutionally impermissible or suspect in the context of domestic legislation. *See, e.g., Fiallo v. Bell,* 430 U.S. 787, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977) (gender and illegitimacy); *Kleindienst v. Mandel,* 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972) (political beliefs); *Nazareno v. Attorney General,* 512 F.2d 936 (D.C.Cir.) (age), *cert. denied,* 423 U.S. 832, 96 S.Ct. 53, 46 L.Ed.2d 49 (1975); *Dunn v. INS,* 499 F.2d 856 (9th Cir.1974) (national origin), *cert. denied,* 419 U.S. 1106, 95 S.Ct. 776, 42 L.Ed.2d 801 (1975).

**6.** In the foreign policy area, for example, the Executive's inherent powers have been held to confer authority upon the President to settle the claims of American nationals against a foreign state as part of a diplomatic agreement. *See, e.g., United States v. Pink,* 315 U.S. 203, 229–30, 62 S.Ct. 552, 565–66, 86 L.Ed. 796 (1942); *Charles T. Main Int'l, Inc. v. Khuzestan Water & Power Auth.,* 651 F.2d 800, 809–10 (1st Cir.1981).

He shall establish such regulations; . . . issue such instructions; and perform such other acts as he deems necessary for carrying out his authority under the provisions of this chapter. . . . He shall have the power and duty to control and guard the boundaries and borders of the United States against the illegal entry of aliens. . . .

The INA also provides that "determination and ruling by the Attorney General with respect to all questions of law [under the statute] shall be controlling," *id.*, and it grants the Attorney General the authority to delegate his powers under the INA to employees of the INS or other Justice Department officials. *Id.*[7] Other provisions of the INA grant broad discretionary powers to the Attorney General or his delegate with regard to the parole power, the underlying predicate of this action.[8] The Attorney General "may . . . in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States. . . ." *Id.* § 1182(d)(5)(A).

The Attorney General may be permitted the greatest degree of discretion under the INA, but other executive officials also benefit from extremely broad delegations. In the event of war or some other national emergency, the President, upon a finding that additional restrictions beyond those supplied in the statute are necessary, may issue a proclamation making it unlawful "for any alien to depart from or enter . . . the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe. . . ." *Id.* § 1185(a)(1).[9] Section 1182(f) of the INA goes even further. It empowers the President, upon a finding that "the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States," to "suspend the entry of all aliens or any class of aliens . . . or to impose on the entry of aliens any restrictions he may deem to be appropriate" for as long as he considers necessary. *Id.* § 1182(f).[10]

■ Despite these broad grants of authority, executive officials "function as agents of Congress in enforcing the law. . . . If such officers depart from the zone of authority charted in the statute they act illegally and their actions can be corrected in the courts." 1 C. Gordon & H. Rosenfield, *supra*, at § 2.2b; *see also, e.g., Lloyd Sabaudo Societa Anonima Per Azioni v. Elting,* 287 U.S. 329, 335, 53 S.Ct. 167, 170, 77 L.Ed. 341 (1932) (courts may review executive action in immigration field to ensure compliance with grant of statutory authority); *Mahler v. Eby,* 264 U.S. 32, 44, 44 S.Ct. 283, 288, 68 L.Ed. 549 (1924) (warrants of deportation could not issue until executive officials made individualized findings that aliens were undesirable residents); *Gegiow v. Uhl,* 239 U.S. 3, 9, 36 S.Ct. 2, 3, 60 L.Ed. 114 (1915) ("[W]hen the record shows that a commissioner of immigration is exceeding his power, the alien may demand

---

**7.** In practice, the Attorney General's authority is delegated to the Commissioner of the INS and to its regional and district directors. 2 K. Davis, *Administrative Law Treatise* § 8:10 (2d ed. 1979).

**8.** The term "parole" is used by both the INS and the courts to "encompass a variety of situations in which temporary entry or stay in the United States is authorized." 1 C. Gordon & H. Rosenfield, *supra*, § 2.54. Although the temporary release of aliens seeking asylum is sometimes referred to by the technical term "deferred inspection," this word is synonymous with "parole" and the latter term is used here.

**9.** This section was cited by President Carter as authority for his action delegating authority to

the Secretary of State and Attorney General to apply additional restrictions to the entrance of Iranian aliens during the Hostage Crisis. *See* Exec.Order No. 12,172 (1979), *reprinted in* 8 U.S.C.A. § 1185 note at 103.

**10.** This section, along with 8 U.S.C. § 1185(a)(1), was cited as authority by President Reagan for his action ordering the Coast Guard to interdict undocumented aliens attempting to enter the southeastern United States from the high seas. *See* Proclamation No. 4865 (1981), *reprinted in* 8 U.S.C.A. § 1182 note at 72; Exec.Order No. 12,324 (1981), *reprinted in* 8 U.S.C.A. § 1182 note at 71.

his release upon habeas corpus.").[11] In practice, however, the vague and sweeping language employed by Congress in these provisions permits wide flexibility in decision-making on the part of the executive officials involved, and the courts are generally reluctant to interfere. *See Saxbe v. Bustos*, 419 U.S. 65, 74, 95 S.Ct. 272, 278, 42 L.Ed.2d 431 (1974); *Knauff*, 338 U.S. at 543–44, 70 S.Ct. at 312–13.

■ Thus, as a result of the existence of inherent executive power over immigration and the broad delegations of discretionary authority in the INA, the separation-of-powers doctrine places few restrictions on executive officials in dealing with aliens who come to this country in search of admission or asylum. The authority of a companion branch, however, is not the only source of restraint upon executive action. We must also consider whether the Haitian plaintiffs in this case have any rights under the Constitution that can permit them to challenge the Executive's refusal to grant them parole.

### B. *The Constitutional Rights of Excludable Aliens*

■ Any analysis of the constitutional rights of aliens in the immigration context must begin by taking note of the fundamental distinction between the legal status of excludable or unadmitted aliens and aliens who have succeeded in effecting an "entry" into the United States, even if their presence here is completely illegal. The Supreme Court originally indicated that the powers of the political branches with respect to the exclusion and expulsion of aliens are equally broad, *see Fong Yue Ting*, 149 U.S. at 713–14, 13 S.Ct. at 1022, but it soon recognized that "an alien who has entered the country, and has become subject in all respects to its jurisdiction, and a part of its population" is entitled to due process under the fifth amendment and cannot be deported "without giving him all opportunity to be heard upon the questions involving his right to be and remain in the United States." *Kaoru Yamataya v. Fisher [The Japanese Immigrant Case]*, 189 U.S. 86, 101, 23 S.Ct. 611, 615, 47 L.Ed. 721 (1903).[12]

11. We realize that the Court's statement in *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543, 70 S.Ct. 309, 312–13, 94 L.Ed. 317 (1950), that "it is not within the province of any court, unless expressly authorized by law, to review the determination of the political branch of the Government to exclude a given alien," has been read by some commentators to cast doubt upon the continuing validity of these precedents. *See, e.g.,* Hart, *The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic*, 66 Harv.L. Rev. 1362 (1953), *reprinted in* P. Bator, P. Mishkin, D. Shapiro, & H. Wechsler, *The Federal Courts and the Federal System* 351–52 & nn. 39–40 (2d ed. 1973). We note, however, that Justice Minton made this comment in the context of discussing executive action that was pursuant to the terms of a congressional delegation. Thus, his statement that judicial review of the merits of an executive decision is barred when the Executive has acted in accordance with the scope of its delegated powers does not necessarily conflict with the teaching of the earlier precedents that the judiciary can enforce executive compliance with statutory and regulatory limitations on its discretion. The Court's repeated statements that decisions by the political branches in the immigration area are "*largely* immune from judicial control," *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210, 73 S.Ct. 625, 628, 97 L.Ed. 956 (1953) (emphasis added), or are "subject only to *narrow* judicial review," *Hampton v. Mow Sun Wong*, 426 U.S. 88, 101 n. 21, 96 S.Ct. 1895, 1904 n. 21, 48 L.Ed.2d 495 (1976) (emphasis added), clearly do not altogether preclude judicial scrutiny, and this principle applies to executive as well as congressional action. *See Mathews v. Diaz*, 426 U.S. 67, 82, 96 S.Ct. 1883, 1892, 48 L.Ed.2d 478 (1976) (narrow standard of judicial review applies to decisions "made by the Congress *or the President* in the area of immigration") (emphasis added).

12. Even in the deportation context, however, the Court was willing to recognize only limited rights for the alien. It held that a trial or other formal judicial hearing was not required; an administrative proceeding was satisfactory. 189 U.S. at 101, 23 S.Ct. at 614. The Court also found that the hearing provided in that case was adequate, even though "[i]t is true that [the alien] pleads a want of knowledge of our language; that she did not understand the nature and import of the questions propounded to her; that the investigation made was a 'pretended' one; and that she did not, at the time, know that the investigation had reference to her being deported from the country." *Id.* at 101–02, 23 S.Ct. at 615. Justice Harlan nevertheless concluded that "[t]hese considerations cannot justify the intervention of the courts." *Id.* at 102, 23 S.Ct. at 615.

While resident aliens, regardless of their legal status, are therefore entitled to at least limited due process rights, aliens "who have never been naturalized, nor acquired any domicile of residence within the United States, nor even been admitted into the country pursuant to law" stand in a very different posture: "As to such persons, the decisions of executive or administrative officers, acting within powers expressly conferred by congress, are due process of law." *Nishimura Ekiu,* 142 U.S. at 660, 12 S.Ct. at 339.

In the eighty years since the Court first recognized this distinction between the rights of excludable and deportable aliens, it has become engrained in our law. Thus, in *Leng May Ma v. Barber,* 357 U.S. 185, 78 S.Ct. 1072, 2 L.Ed.2d 1246 (1958), the court emphasized that

> our immigration laws have long made a distinction between those aliens who have come to our shores seeking admission . . . and those who are within the United States after an entry, irrespective of its legality. In the latter instance the Court has recognized additional rights and privileges not extended to those in the former category who are merely "on the threshold of initial entry."

*Id.* at 187, 78 S.Ct. at 1073 (quoting *Shaughnessy v. United States ex rel. Mezei,* 345 U.S. 206, 212, 73 S.Ct. 625, 629, 97 L.Ed. 956 (1953)); *see also Kwong Hai Chew v. Colding,* 344 U.S. 590, 600, 73 S.Ct. 472, 479, 97 L.Ed. 576 (1953) ("'excludable' aliens . . . are not within the protection of the Fifth Amendment"); *Bridges v. Wixon,* 326 U.S. 135, 161, 65 S.Ct. 1443, 1455, 89 L.Ed. 2103 (1945) (Murphy, J., concurring) ("The Bill of Rights is a futile authority for an alien seeking admission for the first time to these shores."). This principle was reiterated by the Court last Term in *Landon v. Plasencia,* 459 U.S. 21, 32, 103 S.Ct. 321, 329, 74 L.Ed.2d 21 (1982), in which Justice O'Connor noted that

> an alien seeking admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude

aliens is a sovereign prerogative. . . . [H]owever, once an alien gains admission to our country and begins to develop the ties that go with permanent residence his constitutional status changes accordingly.

Aliens seeking admission to the United States therefore have no constitutional rights with regard to their applications and must be content to accept whatever statutory rights and privileges they are granted by Congress. The INA does in fact contain a number of provisions that collectively guarantee at least limited due process protection for excludable aliens. Under 8 U.S.C. § 1226(a), an alien seeking entry is entitled to a hearing on the validity of his application for admission before an immigration judge. At the hearing the alien is permitted the assistance of counsel, *id.* § 1362, and has the right to present evidence in his own behalf, to examine and object to evidence against him, and to cross-examine witnesses presented by the government. 8 C.F.R. § 236.2(a). If the immigration judge determines that the alien is not entitled to admission, this decision may be appealed to the Board of Immigration Appeals (BIA). 8 U.S.C. § 1226(b); 8 C.F.R. § 236.7. An alien may also challenge a final order of exclusion in the federal courts by filing a petition for a writ of habeas corpus. 8 U.S.C. § 1105a(b).

The process of determining the merits of an alien's application for admission is frequently a lengthy one, particularly when the alien is able to hire a skilled immigration lawyer. *Louis III,* 544 F.Supp. at 978. Because the carriers that bring aliens seeking admission to this country can rarely afford to wait until this process is concluded, Congress recognized that it was necessary to permit aliens to make a temporary, unofficial entry into the United States pending the resolution of their applications. *See Shaughnessy v. United States ex rel. Mezei,* 345 U.S. 206, 215, 73 S.Ct. 625, 631, 97 L.Ed. 956 (1953); 8 U.S.C. § 1223(a) (removal of alien from vessel or aircraft for examination by immigration officials "shall not be considered a landing"); *id.* § 1225(b) (alien who does not appear to examining

immigration officer to be "clearly and beyond a doubt entitled to land" may be detained for further inquiry); *id.* § 1182(d)(5)(A) (granting authority to the Attorney General to parole aliens seeking admission into the United States, but providing that "such parole of such alien shall not be regarded as an admission of the alien").

The Supreme Court has consistently rejected claims that the parole or detention of an excludable alien has any effect on his status under the law. Thus, in *Leng May Ma,* Justice Clark noted that "[f]or over a half century this Court has held that the detention of an alien in custody pending determination of his admissibility does not legally constitute an entry though the alien is physically within the United States." 357 U.S. at 188, 78 S.Ct. at 1074. Likewise, he explained that "[t]he parole of aliens seeking admission is simply a device through which needless confinement is avoided while administrative proceedings are conducted. It was never intended to affect an alien's status...." *Id.* at 190, 78 S.Ct. at 1075; *see also Mezei,* 345 U.S. at 215, 73 S.Ct. at 631 (alien permitted to enter pending a decision on admissibility "is treated as if stopped at the border"); *Kaplan v. Tod,* 267 U.S. 228, 230–31, 45 S.Ct. 257, 257–58, 69 L.Ed. 585 (1925); *United States v. Ju Toy,* 198 U.S. 253, 263, 25 S.Ct. 644, 646, 49 L.Ed. 1040 (1905); *Nishimura Ekiu,* 142 U.S. at 661, 12 S.Ct. at 339. This principle—the "entry doctrine" fiction—has been recognized as well by the fifth circuit. *Ahrens v. Rojas,* 292 F.2d 406, 410–11 (5th Cir.1961).

■ There is no question that the Haitian plaintiffs in this case are excludable aliens and have not been formally admitted into the United States. *Louis III,* 544 F.Supp. at 998. Since an alien's legal status is not altered by detention or parole under the entry doctrine fiction, it seems clear that plaintiffs here can claim no greater rights or privileges under our laws than any other group of aliens who have been stopped at the border. The district court, however, concluded that the entry doctrine and the precedents cited above were inapplicable because the Haitian plaintiffs here are challenging their continued incarceration *pending* a determination of admissibility, rather than seeking to compel the government to grant them admission in a legal sense. *Louis III,* 544 F.Supp. at 998. Likewise, the panel distinguished *Mezei* and other immigration decisions on the grounds that those cases concerned "immigration procedures" rather than "the discretionary exercise of the Executive's parole power." *Jean,* 711 F.2d at 1484–85. The panel also considered the entry doctrine inapplicable because "its purpose [is] to limit the procedural rights of an excludable alien 'regarding his application' for admission," *id.* at 1484 (quoting *Plasencia,* 459 U.S. at 31, 103 S.Ct. at 329), and therefore concluded that the Haitian plaintiffs had equal protection rights on the basis of their physical presence within the territorial limits of the United States. *See id.* 1484–85.[13]

■ Although the distinction between parole and admission drawn by the panel and the district court is not an implausible one, we conclude that it cannot be reconciled with the Supreme Court's jurisprudence in this area. In particular, we believe that the Court's decision in *Mezei* is controlling on this issue and that a close examination of the facts at issue in *Mezei* forecloses us from relying on the arguments

---

**13.** Appellees, quoting *Leng May Ma,* 357 U.S. at 187, 78 S.Ct. at 1073, also contend that the entry doctrine is not controlling because it "is not of constitutional origin. It 'is wholly one of statutory construction.'" This argument is disingenuous. The *Leng May Ma* court did not say that the entry doctrine itself is applicable only to matters of statutory construction; it said that the question in the particular case before it—which turned on the meaning of the phrase "within the United States" under the old wording of 8 U.S.C. § 1253(h), providing for discretionary relief from deportation—was one of statutory construction. The Supreme Court has in fact applied the entry doctrine in a number of cases in which the plaintiff's claim turned wholly on an alleged deprivation of liberty in violation of the fifth amendment. *See Mezei,* 345 U.S. at 209, 213, 73 S.Ct. at 627, 629; *Ju Toy,* 198 U.S. at 263, 25 S.Ct. at 646; *Nishimura Ekiu,* 142 U.S. at 664, 12 S.Ct. at 340.

that the panel and the district court found persuasive. Thus, we cannot accept appellees' argument that *Mezei* is not on point because "the alien was challenging non-admissibility, not incarceration." The gravamen of Mezei's complaint was clearly not the government's right to exclude him—a permanent exclusion order had already been entered in his case, and he did not contest it in his habeas petition—but the power of the government to continue to detain him without a hearing pending his deportation. *See Mezei,* 345 U.S. at 207, 73 S.Ct. at 627. Justice Clark stated explicitly in his majority opinion that "[t]he issue is whether the Attorney General's continued exclusion of respondent without a hearing *amounts to an unlawful detention,* so that courts may admit him *temporarily* to the United States on bond until arrangements are made for his departure abroad." *Id.* (emphasis added).

*Mezei* thus did not concern admission or exclusion *per se,* but the rights of an alien when challenging his continued detention

pending the enforcement of an exclusion order that has been entered against him. Since the Supreme Court applied the entry doctrine fiction under these circumstances, *see id.* at 215, 73 S.Ct. at 631, squarely rejecting the territorial argument advanced by the second circuit majority,[14] the doctrine's applicability clearly is not limited to challenges relating to the admission decision itself.[15] *See also Pierre v. United States,* 547 F.2d 1281, 1283, 1289–90 (5th Cir.) (entry doctrine fiction applied to aliens seeking parole pending decision on petition for asylum), *vacated and remanded to consider mootness,* 434 U.S. 962, 98 S.Ct. 498, 54 L.Ed.2d 447 (1977); *Ahrens v. Rojas,* 292 F.2d at 408–11 (entry doctrine bars excludable alien from claiming fifth amendment right to a hearing on the revocation of his parole). We therefore conclude that *Mezei* compels us to hold that the Haitian plaintiffs in this case cannot claim equal protection rights under the fifth amendment, even with regard to challenging the Executive's exercise of its parole discretion.[16]

**14.** The second circuit majority, like the panel and the district court here, reasoned on the basis of *Yick Wo v. Hopkins* that the fifth amendment "is not confined to the protection of citizens. . . . [Its guarantees] extend in fact to all whose presence here brings them within reach of the judicial and administrative processes of the United States Government." *United States ex rel. Mezei v. Shaughnessy,* 195 F.2d 964, 967 (2d Cir.1952), *rev'd,* 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953). Because Mezei's temporary refuge on Ellis Island was within the territorial limits of the United States, the second circuit concluded that he could claim rights under the fifth amendment with regard to his request for temporary admission on bond. As we have seen, the Supreme Court subsequently rejected this reasoning, which is virtually identical to the argument presented by appellees here.

**15.** Although the panel quotes *Landon v. Plasencia* in support of its contention that the entry doctrine fiction applies only to the admission decision, *see Jean,* 711 F.2d at 1481, a reading of the entire case does not support this view. Plaintiff in *Plasencia* was a resident alien who left the country for a few days and was stopped at the border while seeking to smuggle illegal aliens on her return. 459 U.S. at 23, 103 S.Ct. at 324. The Supreme Court ruled that plaintiff was entitled only to an exclusion proceeding, not a deportation hearing, but nonetheless permitted her to claim limited due pro-

cess rights. *Id.* at 33, 103 S.Ct. at 329–30. *Plasencia* is therefore similar to *Kwong Hai Chew,* where the Court found that a resident alien who had spent several months abroad as a seaman on an American-flag vessel had not departed the country in a legal sense. 344 U.S. at 600, 73 S.Ct. at 479. The Court never mentions the entry doctrine in *Plasencia;* its opinion "is ambiguous regarding whether the alien was within or without the territory of United States. . . . [The Court] neither relied on [the territoriality] rationale nor even addressed the issue of physical presence." *Developments in the Law—Immigration Policy and the Rights of Aliens,* 96 Harv.L.Rev. 1286, 1321 n. 48 (1983) [hereinafter cited as *Developments*]. Thus, if *Plasencia* implicated any legal fiction, it is an "exit doctrine" under which resident aliens may physically leave the country without departing in a legal sense, rather than the entry doctrine, which is generally applied to excludable aliens.

**16.** In addition to the arguments discussed above, appellees offer a variety of other reasons for distinguishing *Mezei* from this case— that *Mezei* involved national security considerations, that it was not an asylum case, that it did not involve discrimination on the basis of national origin, and that the Attorney General at the time had no statutory authority to parole aliens. We find these distinctions no more persuasive than the other arguments advanced

We realize, of course, that *Mezei*—like its predecessor, *Knauff*—has been heavily criticized by academic commentators,[17] As an intermediate appellate court, however, we cannot properly question the continued authority of this Supreme Court precedent—a precedent that the Court cited without reconsideration as recently as last Term. *See Plasencia,* 459 U.S. at 32, 103 S.Ct. at 329. With regard to the key issue here—whether the grant or denial of parole is an integral part of the admissions process—*Mezei* is fully in accord with other, less controversial precedents. As far back as 1896 the Supreme Court approved the validity of detention

> as part of the means necessary to give effect to the provisions for the exclusion or expulsion of aliens. . . . Proceedings to exclude or expel would be vain if those accused could not be held in custody pending the inquiry into their true character, and while arrangements were being made for their deportation.

*Wong Wing v. United States,* 163 U.S. 228, 235, 16 S.Ct. 977, 980, 41 L.Ed. 140 (1896); *see also Carlson v. Landon,* 342 U.S. 524, 538, 72 S.Ct. 525, 533, 96 L.Ed. 547 (1952) ("Detention is necessarily a part of this deportation procedure. Otherwise aliens arrested for deportation would have opportunities to hurt the United States during the pendency of deportation proceedings.").[18]

■■■■ These decisions reflect policy imperatives and fundamental principles of national sovereignty that cannot be easily dismissed, regardless of the individual merits of the Court's decisions in *Knauff* and *Mezei.*[19] The reason that Congress has passed legislation regulating the admission of aliens is its concern about how their entry will affect the economic, political, and social well-being of this nation. The grant of parole is subject to certain restrictions and is theoretically of a short-term character,[20] but it does permit the physical entry

by appellees. Any broad conception of "national security" must surely include the ability to regulate entry into a country, and the Supreme Court has made it clear that the standard of review in immigration cases is not affected by "the nature of the policy choice at issue." *Fiallo,* 430 U.S. at 796, 97 S.Ct. at 1480. Similarly, the character of parole is essentially the same regardless of the ultimate claim the alien has raised, *see* 1 C. Gordon & H. Rosenfield, *supra,* at § 2.54, so the fact that Mezei was not seeking asylum is also not significant. The important point is that, like petitioners in this case, he was seeking temporary admission into the United States. Although there are obviously some factual differences between the two cases, the similarity between the nature of the claims presented and the legal status of the plaintiffs is sufficient to conclude that *Mezei* is controlling.

**17.** *See, e.g.,* 2 K. Davis, *supra* note 7, § 11:5 ("The holding that a human being may be incarcerated for life without opportunity to be heard on charges he denies is widely considered to be one of the most shocking decisions the Court has ever rendered."); *Developments, supra* note 15, 96 Harv.L.Rev. at 1322–24.

**18.** Although appellees raise a variety of arguments in an effort to distinguish *Carlson,* the point made by the passage quoted above is a matter of simple common sense that clearly does not depend on the precise statutory predicate involved. While the harm feared from the aliens taken into custody under the Internal Security Act in *Carlson* may be of a different character from that feared in this case, the essential point remains the same—that if aliens can claim that they have a constitutional right to due process regarding temporary release pending a final determination in their cases, the government's ability to control "entry" into this country is severely eroded.

**19.** It is worth pointing out in this context that much of the criticism of *Mezei* and *Knauff* has focussed on the fact that the aliens who were ordered excluded without a hearing in those cases had strong personal or family ties to the United States. *See Mezei,* 345 U.S. at 216–17, 73 S.Ct. at 631–32 (Black, J., dissenting); *Knauff,* 338 U.S. at 539, 70 S.Ct. at 310. Most excludable aliens have far weaker claims to enjoying the benefits of admission into this country, however, and the harsh results of *Knauff* and *Mezei* should not obscure the compelling policy justifications that support the entry doctrine fiction and the general principle that excludable aliens have no rights with regard to their applications for admission or parole.

**20.** The reality can be quite different. The grant of parole authority to the Attorney General under 8 U.S.C. § 1182(d)(5)(A) places no time limitation on parole; moreover, an alien with a skilled attorney can delay the exclusion process for years, and aliens who choose to abscond face only a minimal risk of apprehension.

of the alien into the midst of our society and implicates many of the same considerations—such as employment and national security concerns—that justify restrictions on admission. Parole is an act of extraordinary sovereign generosity, since it grants temporary admission into our society to an alien who has no legal right to enter and who would probably be turned away at the border if he sought to enter by land, rather than coming by sea or air. Judge Learned Hand emphasized this point in his dissent to the second circuit's decision in *Mezei,* stating:

> I do not believe that an alien so situated can force us to admit him at all. Suppose ... that the respondent had refused to let him leave the ship. I do not see what legal process Mezei could have invoked to get ashore before she left; nor do I see what theory supports the claim that, because we did not impose upon him this harsher alternative, but *ex gratia,* allowed him to land until his case was decided, we must grant him even a limited version of that entry which the statute denies him. For we must remember that the order [releasing Mezei upon bond] does give him a privilege of entry.... Moreover, although that privilege is hedged about in various ways, he will be able nevertheless to mingle with the mass of citizens....

*United States ex rel. Mezei v. Shaughnessy,* 195 F.2d 964, 970–71 (L. Hand, J., dissenting) (1952). We follow Judge Hand and the Supreme Court in concluding that since the immediate implications of parole and legal admission are identical in a number of important respects, excludable aliens cannot challenge either admission or parole decisions under a claim of constitutional right.

 Of course, there are certain circumstances under which even excludable aliens are accorded rights under the Constitution. Appellees seize on these exceptions as a basis for denying the validity of the entry

doctrine fiction entirely, asserting that "[t]he critical factor in determining whether the Fifth Amendment applies is not the citizenship or immigration status of the person, but the mere fact of government action.... [T]he Constitution limits the power of government whenever, wherever, and upon whomever the government acts." If this view were correct, all aliens in all circumstances would presumably be entitled to the full range of constitutional protections. This is clearly not the case. Instead, the courts have made it plain that the degree of constitutional protection accorded an alien in a particular situation is to be determined by such factors as the legal status of the alien and the context of the government action he seeks to challenge. For example, those with the status of deportable aliens are constitutionally entitled to rights in the deportation context that are inapplicable to exclusion proceedings. Illegal or resident aliens may also claim other rights under the fifth and fourteenth amendments. *See, e.g., Plyler v. Doe,* 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982); *Hampton v. Mow Sun Wong,* 426 U.S. 88, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976); *Graham v. Richardson,* 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971); *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886).[21]

The courts have also recognized that aliens can raise constitutional challenges to deprivations of liberty or property outside the context of entry or admission, when the plenary authority of the political branches is not implicated. Aliens seized by United States officials for suspected involvement in criminal activity are entitled to the same constitutional rights that normally apply in such proceedings. *See, e.g., Wong Wing,* 163 U.S. at 238, 16 S.Ct. at 981 ("[A]liens shall not be held to answer for a capital or other infamous crime, unless on a presentment or indictment of a grand jury, nor be deprived of life, liberty, or property without

**21.** These cases, as well as *Wong Wing v. United States,* 163 U.S. 228, 16 S.Ct. 977, 41 L.Ed. 140 (1896), were cited by appellees in support of their argument that excludable aliens have rights under the fifth amendment. In fact, each concerned resident aliens.

due process of law."); [22] *United States v. Henry,* 604 F.2d 908, 914 (5th Cir.1979) ("[A]n alien who is within the territorial jurisdiction of this country, whether it be at the border or in the interior, in a proper case and at the proper time, is entitled to those protections guaranteed by the Fifth Amendment in criminal proceedings which would include the *Miranda* warning."). The courts have further ruled that aliens who are the victims of unconstitutional government action abroad are protected by the Bill of Rights if the government seeks to exploit fruits of its unlawful conduct in a criminal proceeding in the United States. *United States v. Demanett,* 629 F.2d 862, 866 (3d Cir.), *cert. denied,* 450 U.S. 910, 101 S.Ct. 1347, 67 L.Ed.2d 333 (1980); *United States v. Toscanino,* 500 F.2d 267, 280 (2d Cir.1974); *cf. United States v. Tiede,* 86 F.R.D. 227, 242–44 (U.S. Ct. for Berlin 1979) (protections of Bill of Rights apply to friendly aliens in the American sector of West Berlin). The Supreme Court has also recognized that even non-resident aliens are entitled to the protection of the fifth amendment's prohibition on unlawful takings. *Russian Volunteer Fleet v. United States,* 282 U.S. 481, 489, 491–92, 51 S.Ct. 229, 232, 75 L.Ed. 473 (1931).

These authorities, however, do not mandate the conclusion that excludable aliens such as the Haitian plaintiffs can claim equal protection rights under the fifth amendment with regard to parole. *Russian Volunteer Fleet* can be distinguished because it clearly does not implicate in any way the powers of the national government over immigration. When the government seizes the property of foreign nationals within this country, its actions do not fall within a sphere of plenary executive and legislative authority, and it therefore cannot claim that the aliens involved are entitled only to the degree of due process that Congress is prepared to extend them as a matter of grace.

Similar considerations apply in the context of criminal prosecutions. When the government subjects an alien to the criminal process it is plainly no longer seeking to effectuate its power to control admission into the United States by removing the alien from this country. The arrests of the aliens in *Wong Wing* and *Henry* may have grown out of the Executive's efforts to control the entry of foreigners into the United States,[23] but the decision by government officials to subject them to criminal prosecution or punishment, rather than deportation, completely changed the nature of the proceedings. From that point forward any action taken by the government derived not from its power to control admission into this country, but from the powers of the Executive over law enforcement. The government's actions in prosecuting Henry and imprisoning Wong Wing therefore fell outside the plenary power to control immigration that justifies the extraordinary executive and congressional latitude in that area. This critical distinction was emphasized by the Court in *Wong Wing:*

> No limits can be put by the courts upon the power of congress to protect, *by summary methods,* the country from the advent of aliens. . . . But to declare unlawful residence within the country to be an infamous crime, punishable by deprivation of liberty and property, would be to pass out of the sphere of constitutional legislation, unless provision were made

**22.** Although *Wong Wing* could be distinguished on the grounds that it involved resident aliens, it was decided before *The Japanese Immigrant Case* distinguished between the degree of legal protection enjoyed by deportable and excludable aliens and therefore speaks in terms of general applicability. *See* 163 U.S. at 237, 16 S.Ct. at 980; *Developments, supra* note 15, 96 Harv.L.Rev. at 1316 n. 20. We believe that its basic principle—that criminal punishment may not be imposed without due process protections—is relevant to excludable aliens and see

no reason to reconsider this court's decision in *United States v. Henry,* 604 F.2d 908 (5th Cir. 1979).

**23.** The aliens in *Wong Wing* were imprisoned under a statute that made illegal residence within the United States by Chinese aliens a crime. 163 U.S. at 233–34, 16 S.Ct. at 979–80. In *Henry* the alien was charged with falsely representing himself to be an American citizen. 604 F.2d at 910.

that the fact of guilt should first be established by a judicial trial.

163 U.S. at 237, 16 S.Ct. at 981 (emphasis added). Similarly, the fifth circuit in *Henry* stressed that the excludable alien in that case "was entitled to the rights guaranteed by the Fifth Amendment, including the *Miranda* warning, *only* when the questioning of the immigration officials became an interrogation that was custodial in nature in which information was sought for the purpose of using it against him in a criminal proceeding." 604 F.2d at 914 (emphasis added).

These holdings reflect the Supreme Court's recognition of a significant distinction between the degree of due process protection implicated by statutory provisions that "contemplate only the exclusion or expulsion of [aliens] and those which provide for their imprisonment at hard labor, pending which their deportation is suspended." *Wong Wing,* 163 U.S. at 236, 16 S.Ct. at 980. This principle is also reflected in Supreme Court decisions holding that the full panoply of due process rights is not applicable in deportation proceedings because they are not criminal in character. *See, e.g., Galvan v. Press,* 347 U.S. 522, 531, 74 S.Ct. 737, 742, 98 L.Ed. 911 (1954); *Fong Yue Ting,* 149 U.S. at 730, 13 S.Ct. at 1028.[24]

Some courts and commentators have suggested that when an exercise of the government's power to exclude results in an indefinite detention of an excludable alien, at some point the continued imprisonment becomes punishment, regardless of the legal justifications or fictions involved. These authorities contend that at this juncture the government should be required to make

some justification to continue to detain the alien. *See, e.g., Rodriguez-Fernandez v. Wilkinson,* 654 F.2d 1382, 1387 (10th Cir. 1981); *Soroa-Gonzalez v. Civiletti,* 515 F.Supp. 1049, 1056 n. 6 (N.D.Ga.1981); *Fernandez-Roque v. Smith,* 91 F.R.D. 239, 243 (N.D.Ga.1981), *appeal dismissed,* 671 F.2d 426 (11th Cir.1982); Note, *Constitutional Limits on the Power to Exclude Aliens,* 82 Colum.L.Rev. 957, 980 (1982); Note, *The Constitutional Rights of Excluded Aliens: Proposed Limitations on the Indefinite Detention of the Cuban Refugees,* 70 Geo.L.J. 1303, 1306 (1982). In *Rodriguez-Fernandez,* for example, the tenth circuit ruled that detention of excludable aliens "is permissible during proceedings to determine eligibility to enter and, thereafter, during a reasonable period of negotiations for their return to the country of origin...." After that time, the alien is entitled to release unless the government can demonstrate "that the detention is still temporary pending expulsion, and not simply incarceration as an alternative to departure." 654 F.2d at 1389–90.[25]

We could distinguish *Rodriguez-Fernandez* from this case on the grounds that the former involved an alien against whom an exclusion order had already been entered and who was clearly unable to return to his country of origin.[26] Indeed, the tenth circuit placed no time limits on the government's ability to detain excludable aliens pending the admission decision. *Id.* at 1389. Nevertheless, we detect two significant problems that prevent us from endorsing the tenth circuit's reasoning. The first—which is controlling from our point of

---

**24.** For example, aliens may be arrested without a warrant for deportation, *Abel v. United States,* 362 U.S. 217, 233–34, 80 S.Ct. 683, 694–95, 4 L.Ed.2d 668 (1960), and may be deported for illegal behavior that occurred before Congress outlawed it since deportation is not considered "punishment" under the ex post facto clause of the Constitution, *see Harisiades v. Shaughnessy,* 342 U.S. 580, 594–95, 72 S.Ct. 512, 521–22, 96 L.Ed. 586 (1952).

**25.** *Cf. Fernandez-Roque,* 91 F.R.D. at 243 (pending exclusion hearings, the continued detention of aliens who are not likely to be re-

turned to their country of origin, who have committed no crimes in the United States, who are not a threat to national security or the public interest, and who were invited to this country by the President, "constitutes an abuse of discretion of the parole authority").

**26.** Haiti has indicated that it is willing to accept the return of these aliens. *Hearing, supra* note 3, at 11. Although plaintiffs contend that they fear prosecution if they return to Haiti, its government has denied that they would be subject to any reprisals.

view—is that it cannot be reconciled with the Supreme Court'. decision in *Mezei,* which held that an excludable alien could not challenge his continued detention without a hearing. The second difficulty is that if the prospect of indefinite detention is held to be sufficient to require the government to meet some judicially-imposed standard to continue to detain an alien, the plenary authority of the political branches in the exclusion area is largely rendered nugatory. The prospect of indefinite confinement, after all, can be raised by the refusal of an excludable alien to return home, or the refusal of his country of origin or any other country to accept him.

This is the critical flaw with the second circuit's decision in *Mezei* and the tenth circuit's decision in *Rodriguez-Fernandez,* each of which based the alien's right to challenge his continued confinement on whether or not he had a foreseeable chance of being able to go elsewhere. At first glance, this is an attractive solution. It seems both humane and eminently realistic, because it does not turn on legal fictions and distinctions that appear to lack practical substance. Unfortunately, this approach would ultimately result in our losing control over our borders. A foreign leader could eventually compel us to grant physical admission via parole to any aliens he wished by the simple expedient of sending them here and then refusing to take them back. In the probable absence of any reliable information about such aliens beyond what they cared to provide, could the government meet its burden under some judicially-imposed standard of showing that indefinite detention was justified? It seems unlikely.

Mindful of the Supreme Court's warning that "[a]ny rule of constitutional law that would inhibit the flexibility of the political branches of government to respond to changing world conditions should be adopted only with the greatest caution," *Mathews v. Diaz,* 426 U.S. 67, 81, 96 S.Ct. 1883, 1892, 48 L.Ed.2d 478 (1976), we conclude that we must resist the temptation to tamper with the authority of the Executive by ruling that excludable aliens have consti-

tutional rights in this area, even with regard to their applications for parole.

## C. *Judicial Review of Executive Discretion*

Although we hold that the Haitian plaintiffs cannot challenge the refusal of executive officials to parole them on the basis of the fifth amendment's equal protection guarantee, this is not the end of our inquiry. That the authority of the political branches in this area is plenary does not mean that it is wholly immune from judicial review. As two leading commentators have noted, the Executive's discretionary authority concerning parole decisions "is broad, but not unlimited. It may be subjected to judicial scrutiny on a charge that discretion was arbitrarily exercised or withheld." 1 C. Gordon & H. Rosenfield, *supra,* at § 2.54. This principle has been recognized by our colleagues on the second and fourth circuits, who have held that an executive official's decision to deny parole to an unadmitted alien may be subject to judicial review for abuse of discretion. *Bertrand v. Sava,* 684 F.2d 204, 210 (2d Cir.1982); *Palma v. Verdeyen,* 676 F.2d 100, 105 (4th Cir.1982); *see also Pierre,* 547 F.2d at 1289.

*Bertrand* in particular presents a fact situation highly similar to that at issue in this case. The Haitian plaintiffs in *Bertrand* alleged that the INS district director discriminated against them in the exercise of his parole authority, and contended that his action constituted an abuse of discretion since he did not claim to act pursuant to any national policy adopted by the political branches of the federal government. The second circuit concluded that it did have the authority to review the decisions of the district director, reasoning that:

Discretion vested by statute in agents of the federal government is rarely, if ever, entirely free from judicial review for abuse. The principle that discretionary power is not absolute power is fundamental to our constitutional form of government. The discretionary power to parole unadmitted aliens granted by statute to the Attorney General, and delegat-

ed by him to INS District Directors, is broad, but it is not without limits.

684 F.2d at 210.

■ The district court below reached a similar destination by a different route, suggesting that "[p]laintiffs are persons within the territorial jurisdiction of the United States and they cannot be denied their liberty without due process of law." *Louis III,* 544 F.Supp. at 990. We have rejected the argument that the entry doctrine fiction is inapplicable in the context of parole decisions, so we conclude that the district court erred to the extent that it based its jurisdiction to review these determinations on constitutional grounds. The basis for jurisdiction here must be found elsewhere, in the principle that agencies must respect the statutory limits on their discretion, *see, e.g., Lloyd Sabaudo,* 287 U.S. at 335, 53 S.Ct. at 170; *Mahler,* 264 U.S. at 44, 44 S.Ct. at 288; *Gegiow,* 239 U.S. at 9, 36 S.Ct. at 3; *see also supra* note 11, and in the recognition that "agency deviation from its own regulations and procedures may justify judicial relief in a case otherwise properly before the court." *Haitian Refugee Center v. Smith [HRC],* 676 F.2d 1023, 1041 n. 48 (5th Cir. Unit B 1982); [27] *see also United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260, 267, 74 S.Ct. 499, 503, 98 L.Ed. 681 (1954).

■ The discretionary decisions of executive officials in the immigration area are therefore subject to judicial review, but the scope of that review is extremely limited.

The Supreme Court has repeatedly emphasized that "the power over aliens is of a political character and therefore subject only to narrow judicial review." *Mow Sun Wong,* 426 U.S. at 101 n. 21, 96 S.Ct. at 1904 n. 21; *see also Fiallo v. Bell,* 430 U.S. 787, 793 n. 5, 97 S.Ct. 1473, 1478 n. 5, 52 L.Ed.2d 50 (1977) ("Our cases reflect acceptance of a limited judicial responsibility under the Constitution ... with respect to the power of Congress to regulate the admission and exclusion of aliens...."). Because the political branches share concurrent authority over immigration matters, it follows that both executive and congressional actions are to be regulated by the judiciary according to the same narrow standard of review. *See Mathews v. Diaz,* 426 U.S. at 81–82, 96 S.Ct. at 1892–1893 ("The reasons that preclude judicial review of political questions also dictate a narrow standard of review of decisions made by Congress *or the President* in the area of immigration....") (emphasis added); *Harisiades v. Shaughnessy,* 342 U.S. 580, 589, 72 S.Ct. 512, 519, 96 L.Ed. 586 (1952) (immigration matters "are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference") (emphasis added).

The Supreme Court's ruling in *Kleindienst v. Mandel,* 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972) underlines the judiciary's limited role in reviewing the discretionary decisions of executive officials in

---

**27.** The district court's conclusion that petitioners here could claim rights under the fifth amendment was at least partially based on this court's decision in *HRC v. Smith,* in which the court stated that "[w]e therefore find sufficient legal warrant under the fifth amendment for ... requiring the government to submit a procedurally fair plan for the orderly reprocessing of the plaintiffs' asylum applications." 676 F.2d at 1041. The *HRC* panel also stated, however, that "we conclude that the district court properly exercised its jurisdiction under 8 U.S.C. § 1329 to order the government to submit a reprocessing plan which adheres to INS regulations and operating procedures," regardless of "[w]hether or not these procedures are mandated by the due process guarantee." *Id.* at 1041 n. 48. The *HRC* panel's decision turned on its finding that although "Congress and the

executive have created ... a constitutionally protected right to petition our government for political asylum," *id.* at 1038, INS officials attempting to cope with a backload of cases had deliberately "created conditions which negated the possibility that a Haitian's asylum hearing would be meaningful in either its timing or nature. Under such circumstances, the right to petition for political asylum was effectively denied." *Id.* at 1040. *HRC v. Smith* therefore falls into the category of those cases in which judicial relief is mandated by "agency deviation from its own regulations and procedures," *id.* at 1041 n. 48, and the court's finding that the agency had acted in violation of its statutory obligations was a sufficient basis for the court's holding. To the extent that *HRC* may be read to conflict with our decision in this case, the applicable language in *HRC* is disapproved.

the immigration field. In that case the Court considered a challenge to the Attorney General's refusal to grant a waiver permitting a foreign Marxist to visit the United States on a lecture tour. Although the first amendment rights of American citizens were implicated by the Attorney General's decision, the Court held that "when the Executive exercises this [delegated] power negatively on the basis of *a facially legitimate and bona fide reason,* the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against the First Amendment interests of those who seek personal communication with the applicant." 408 U.S. at 770, 92 S.Ct. at 2585 (emphasis added). Similarly, the second circuit stressed in *Bertrand* that

> as long as the Attorney General exercises his broad discretion under 8 U.S.C. § 1182(d)(5) to determine whether unadmitted aliens may be paroled pending final determination of their applications for admission to the United States, his decision may not be challenged on the grounds that the discretion was not exercised fairly in the view of a reviewing court or that it gave too much weight to certain factors relevant to the risk of abscondence and too little to others.

684 F.2d at 212.[28]

■■■■ Thus, under the approach taken by the Supreme Court in *Kleindienst v. Mandel* and adopted by the second circuit in *Bertrand,* the critical question a court must answer when reviewing an alien's challenge to the denial of his request for parole is whether the immigration officials involved were acting within the scope of their delegated powers. As we noted in section II.A. above, Congress has delegated remarkably broad discretion to executive officials under the INA, and these grants of statutory authority are particularly sweeping in the context of parole. In exercising his parole discretion, the Attorney General is simply instructed that he "may . . . in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission. . . ." 8 U.S.C. § 1182(d)(5)(A). Logically, of course, "the obverse of the grant of discretionary authority in § 1182(d)(5) to parole an excluded alien is a grant of authority to deny parole." *Palma,* 676 F.2d at 104. This grant can certainly be inferred from 8 U.S.C. § 1225(b), which provides that immigration officials shall detain "[e]very alien . . . who may not appear . . . to be clearly and beyond a doubt entitled to land", and 8 U.S.C. § 1227(a), which permits the Attorney General to continue to detain an excluded alien if he concludes that "immediate deportation is not practicable or proper."[29] In view of these provisions, immigration officials clearly have the authority to deny parole to unadmitted aliens if they can advance "a facially legitimate and bona fide reason" for doing so.

**28.** Appellees contend that the present case involves no national security or foreign policy considerations and therefore assert that the actions of executive officials here warrant more searching judicial scrutiny than has been applied in other immigration cases in the past. In *Fiallo v. Bell,* however, the Court squarely rejected a similar attempt to distinguish prior decisions in the immigration field as relating to national security or foreign policy matters, stating that "[w]e find no indication in our prior cases that the scope of judicial review is a function of the nature of the policy choice at issue." 430 U.S. at 796, 97 S.Ct. at 1480. In addition, the Supreme Court has long recognized that the exclusion process is intimately related to considerations of both national security and foreign policy. *See, e.g., Harisiades,* 342 U.S. at 588–89, 72 S.Ct. at 519 ("[A]ny policy toward aliens is vitally and intricately interwoven with contemporary policies in regard to the conduct of foreign relations . . ."); *The Chinese Exclusion Case,* 130 U.S. at 606, 9 S.Ct. at 630 (noting that threats to national security can come both "from the foreign nation acting in its national character or from vast hordes of its people crowding in upon us"). We therefore see no reason for concluding that the traditional justifications for recognizing wide latitude for executive decision-making in this field are inapplicable here.

**29.** No time limit is put upon the Attorney General's authority to detain an alien under § 1227(a). In contrast, § 1252(c) limits detention of a *resident* alien subsequent to the entry of a final order of deportation to six months.

The Haitian plaintiffs contend that such a reason was lacking in this case, submitting that they were the victims of national origin discrimination. Plaintiffs and the district court both stressed that the challenged actions here were those of executive officials rather than Congress, apparently believing that the Executive is clearly prohibited from adopting policies on its own motion that discriminate on the basis of national origin in the immigration field while Congress is just as clearly permitted to do so. Because the government has contended throughout this case that its new detention policy does not discriminate on the basis of national origin, resolution of this question is not essential to our holding; however, we believe that responsible executive officials such as the President or Attorney General possess this authority under the INA.[30] Nevertheless, since the discretion of lower-level immigration officials is circumscribed not only by legislative enactments but also by the instructions of their superiors in the executive branch, our conclusion that the Executive's policy is consistent with the power delegated by Congress does not end the process of judicial inquiry here. The district court must still determine whether the actions of lower-level officials in the field conform to the policy statements of their superiors in Washington. For as the second circuit correctly noted in *Bertrand:*

> [T]he constitutional authority of the political branches of the federal government to adopt immigration policies based on criteria that are not acceptable elsewhere in our public life would not permit an immigration official, in the absence of such policies, to "apply neutral regulations to discriminate on [the basis of race and national origin]."

684 F.2d at 212 n. 12 (quoting *Vigile v. Sava,* 535 F.Supp. 1002, 1016 (S.D.N.Y. 1982)).

The district court on remand should conduct such proceedings as are necessary to determine whether there exists a facially legitimate and bona fide reason for the government's decision to deny parole to the class members presently in detention, remembering that it is not the court's proper role "to disregard the [stated criteria employed] or to substitute its own policy preferences for those of the official vested by law with discretionary authority to act on requests for parole." *Id.* at 217. The district court should consider (1) whether local immigration officials in fact exercised their discretion under § 1182(d)(5)(A) to make individualized determinations and (2) whether the criteria employed in making those determinations were consistent with

---

**30.** In view of the Supreme Court's repeated emphasis on the concurrent nature of executive and legislative power in this area and the sweeping congressional delegations of discretionary authority to the Executive under the INA, there is little question that the Executive has the power to draw distinctions among aliens on the basis of nationality. This issue was squarely presented to the D.C. Circuit in *Narenji v. Civiletti,* 617 F.2d 745 (D.C.Cir.1979), *cert. denied,* 446 U.S. 957, 100 S.Ct. 2928, 64 L.Ed.2d 815 (1980), in which the court upheld a regulation requiring nonimmigrant alien postsecondary school students of Iranian citizenship or birth to provide information to the INS concerning their residence and academic status. The court held that the challenged regulation was within the Attorney General's authority under 8 U.S.C. § 1103(a), which permits the Attorney General to "perform such other acts as he deems necessary" for carrying out his responsibility to administer and enforce the immigration laws, and concluded that "[d]istinctions on the basis of nationality may be drawn in the immigration field by the Congress or the Executive. [Citations omitted]. So long as such distinctions are not wholly irrational they must be sustained." 617 F.2d at 747.

Although Congress significantly altered the system of nationality-based quotas for the issuance of immigration visas in 1965, *see* 1 C. Gordon & H. Rosenfield, *supra,* at § 1.4c, it has not disturbed a variety of administrative provisions that distinguish among aliens on the basis of national origin. *See, e.g.,* 8 C.F.R. § 101.1 (presumption of lawful admission for certain national groups); *id.* § 212.1 (documentary requirements for nonimmigrants of particular nationalities); *id.* § 252.1 (relaxation of inspection requirements for certain British and Canadian crewmen). The courts have generally viewed such classifications as within the permissible scope of executive discretion. *See, e.g., Nademi v. INS,* 679 F.2d 811 (10th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 161, 74 L.Ed.2d 134 (1982); *Malek-Marzban v. INS,* 653 F.2d 113 (4th Cir.1981); *Yassini v. Crosland,* 618 F.2d 1356 (9th Cir.1980).

the statutory grant of discretion by Congress, the regulations promulgated by the agencies involved, and the policies which had been established by the President and the Attorney General. If the court should find that low-level immigration officials have discriminated on the basis of national origin despite the adoption of a contrary policy by their superiors in the executive branch, such conduct would constitute an abuse of discretion that would justify appropriate relief. Without expressing any opinion on this score, we note that the district court may wish to reconsider whether class treatment is still an appropriate vehicle for making the determinations set forth above. We therefore remand for further proceedings in light of this opinion.

## III. NOTICE OF THE RIGHT TO SEEK ASYLUM

Plaintiffs also contend that the class members are entitled to notice of their right to present a claim to the district director for political asylum under the Refugee Act of 1980 and its attendant regulations. The district court dismissed this claim on the grounds that it would "merge" into a final order of exclusion and was therefore subject to review only on habeas corpus pursuant to 8 U.S.C. § 1105a. *Louis v. Meissner [Louis II]*, 532 F.Supp. 881, 888–89 (S.D.Fla.1982). We conclude that neither the finality provision nor the exhaustion requirement of § 1105a bars review of this claim and therefore reach the merits, holding that plaintiffs do not have a right to be notified of the opportunity to seek asylum provided by the Refugee Act of 1980.

### A. *The Jurisdictional Issue*

The first question we must resolve is whether this court can properly reach the notice issue in the absence of a final order of exclusion. The problematic statutory authority here is 8 U.S.C. § 1105a, which provides in relevant part:

(b) Notwithstanding the provisions of any other law, any alien against whom a *final* order of exclusion has been made heretofore or hereafter ... may obtain judicial review of such order by habeas corpus proceedings *and not otherwise.*

(c) An order of deportation or of exclusion shall not be reviewed by any court if the alien has not exhausted the administrative remedies available to him as of right under the immigration laws and regulations....

(emphasis added). Because plaintiffs in this case have not yet undergone exclusion hearings, the district court was confronted with the question whether § 1105a(b) applies only to final orders of exclusion or whether it also precludes review of challenges to preliminary procedures employed in exclusion proceedings prior to the entry of a final order. The district court concluded that the provisions of the statute are "ambiguous and unclear" in this regard and sought additional guidance by scrutinizing the legislative history of § 1105a. Finding that "Congress' intent in enacting Section 1105a was to end the seemingly endless procedural delays that allowed an excludable or deportable alien to prolong his departure from this country," the district court reasoned that "[i]t is inconceivable to believe that Congress would legislate against the delays that can follow the entry of a final order of exclusion without intending to cut off similar dilatory practices that might be utilized prior to the entry of an order." *Louis II*, 532 F.Supp. at 886–87. The lower court therefore dismissed plaintiffs' claim.

Shortly after the district court rendered its decision this court recognized a narrow exception to the general rule of nonreviewability pending the entry of a final order in *HRC v. Smith*. In that case the question was whether the district court could review the plaintiffs' challenges to such INS practices as setting ten-day limits for the filing of asylum claims and scheduling many hearings on asylum petitions simultaneously.[31]

31. Deportable aliens, such as the Haitians involved in *HRC v. Smith,* are subject to a different review procedure under § 1105a(a), whereby the circuit courts of appeal are vested with exclusive jurisdiction to review "all final orders of deportation ... made against aliens within

The *HRC* panel concluded that because the complaints raised by the plaintiffs addressed "matters alleged to be part of a pattern and practice by immigration officials" to violate the rights of aliens under the Refugee Act, they constituted wrongs "which are independently cognizable in the district court under its federal question jurisdiction." 676 F.2d at 1033.[32] The court further explained that:

> The distinction we draw is one between the authority of a court of appeals to pass upon the merits of an individual deportation order and any action in the deportation proceeding to the extent it may affect the merits determination, on the one hand, and, on the other, the authority of a district court to wield its equitable powers *when a wholesale, carefully orchestrated, program of constitutional violations is alleged.*

*Id.* (emphasis added); *see also Cheng Fan Kwok v. INS,* 392 U.S. 206, 210, 88 S.Ct. 1970, 1973, 20 L.Ed.2d 1037 (1968); *Fleurinor v. INS,* 585 F.2d 129, 135–36 & n. 6 (5th Cir.1978) (noting that although the circuit court lacked jurisdiction under § 1105a(a), "allegations of procedural irregularities in the asylum proceeding would be reviewable in the appropriate district court"); *Orantes-Hernandez v. Smith,* 541 F.Supp. 351, 364 (C.D.Cal.1982).

The *HRC* panel therefore emphasized the importance of distinguishing between an individual challenge on a preliminary procedural matter, which the finality provisions of § 1105a would govern, and allegations of widespread abuses by immigration officials. In the latter case, postponing conclusive

judicial resolution of a disputed issue that affects an entire class of aliens until an individual petitioner has the opportunity to litigate it on habeas corpus would foster the very delay and procedural redundancy that Congress sought to eliminate in passing § 1105a. For this reason, we conclude that § 1105a(b) does not prohibit us from considering plaintiffs' claims that they have a right to notice of the opportunity to seek asylum. We stress that our holding is a narrow one that should not be construed to permit judicial review of run-of-the-mill interlocutory procedural rulings by an immigration judge with which an alien happens to disagree. As the panel stated in *HRC v. Smith,*

> [s]uch a result would indeed defeat the congressional purpose behind the enactment of section [1105a]—the elimination of dilatory tactics by aliens challenging deportation orders in a piecemeal fashion. . . . We do not intend by our holding today to emasculate that solution, and given the narrowness of our holding, we do not expect such a result.

676 F.2d at 1033.

■ The district court also suggested that review of plaintiffs' claim of a right to notice was barred by their failure to exhaust their administrative remedies as required by § 1105a(c). *Louis II,* 532 F.Supp. at 887–88 & n. 8. As the *HRC* court pointed out, however, "[i]t is tautological that the exhaustion doctrine does not preclude the exercise of jurisdiction when there are no further administrative remedies to pursue." 676 F.2d at 1035. This is precisely the situation with regard to petitioners'

---

the United States pursuant to administrative proceedings under section 1252(b) [deportation hearings]. . . ." Although the review procedure is therefore somewhat different for resident aliens, the basic considerations of fairness and judicial economy that concerned the *HRC* court are clearly applicable in the present context as well.

**32.** To the extent that the jurisdictional arguments of *HRC* may be read as resting on constitutional grounds, the applicable language is disapproved. In this case, plaintiffs' claim could be heard by the district court pursuant to its jurisdiction under 28 U.S.C. § 1331, since

petitioners are seeking a determination whether the Refugee Act of 1980 and its accompanying regulations require the INS to notify aliens of their right to apply for political asylum prior to the commencement of exclusion proceedings before an immigration judge. *See, e.g.,* 8 U.S.C. § 1101(a)(42); *id.* § 1158(a); *id.* § 1253(h); 8 C.F.R. § 208.3. Because plaintiffs' complaint raises the issue whether the agency has acted in accord with the statutory mandate of Congress, as well as its own regulations and procedures, the district court can sustain jurisdiction over this claim under the reasoning set forth in section II.C above.

claim on the notice issue. Under the applicable regulations, an alien who wishes to apply for asylum can get two bites at the apple: first, by presenting his claim to the INS district director prior to the commencement of exclusion proceedings against him, 8 C.F.R. § 208.3(a), and second, by filing a request with the immigration judge after the exclusion hearing has begun. *Id.* § 208.3(b). If the alien does not file an application with the district director before the commencement of the exclusion proceedings against him, this first opportunity to seek asylum is simply lost, because the immigration judge and the Board of Immigration Appeals have no authority over, or ability to remand proceedings to, the district director. *HRC v. Smith,* 676 F.2d at 1036 (noting that "the BIA could not grant relief for procedural errors in asylum proceedings before the district director"); *see also* 8 C.F.R. § 3.1(b). The existence of unexhausted administrative remedies—such as a request to withhold deportation under 8 U.S.C. § 1253(h)—applicable to an alien's opportunity to apply for asylum before the immigration judge therefore cannot justify invoking the exhaustion doctrine with respect to a challenge to the procedure before the district director. *See HRC v. Smith,* 676 F.2d at 1035–36. We conclude that neither the finality provision of § 1105a(b) nor the exhaustion requirement of § 1105a(c) bars us from reaching the merits of plaintiffs' claim at this time.

## B. *The Merits*

In *HRC v. Smith* this court recognized that the Refugee Act of 1980 and its accompanying regulations created a "right to petition our government for political asylum." 676 F.2d at 1038. Several courts have reasoned that the government must be required to notify aliens who face exclusion or deportation of the opportunity to apply for asylum if this right is to be effectuated. *See, e.g., Jean,* 711 F.2d at 1507–08; *Or-*

*antes-Hernandez,* 541 F.Supp. at 361; *Nunez v. Boldin,* 537 F.Supp. 578, 586 (S.D. Tex.), *appeal dismissed,* 692 F.2d 755 (5th Cir.1982). We disagree.

The first point that requires clarification is the nature of the right recognized in *HRC v. Smith.* The Supreme Court has recognized that some state or federal laws can, by creating substantive entitlements to particular government benefits, lead to the constitutional protection of those benefits as "liberty" or "property" interests within the meaning of the Due Process Clause of the fourteenth amendment. *See, e.g., Wolff v. McDonnell,* 418 U.S. 539, 577, 94 S.Ct. 2963, 2985, 41 L.Ed.2d 935 (1974). However, when dispensation of a statutory benefit is clearly at the discretion of an agency, or when a statute only provides that certain procedural guidelines be followed in arriving at a decision, then there is no creation of a substantive interest protected by the Constitution. *Hewitt v. Helms,* —— U.S. ——, ——, 103 S.Ct. 864, 871, 74 L.Ed.2d 675 (1983); *Bishop v. Wood,* 426 U.S. 341, 345–47, 96 S.Ct. 2074, 2077–78, 48 L.Ed.2d 684 (1976); *Olegario v. United States,* 629 F.2d 204, 223–224 (2d Cir.1980), *cert. denied,* 450 U.S. 980, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981).

Under this analysis, it is clear that the Refugee Act does not create an entitlement to asylum. Instead, it states merely that an alien "*may* be granted asylum *in the discretion* of the Attorney General if the Attorney General determines that such alien is a refugee within the meaning of [8 U.S.C. § 1101(a)(42)(A) ]." 8 U.S.C. § 1158(a) (emphasis added).[33] Because the Act creates only a right to petition for asylum, it carries with it no guarantee of securing the substantive relief sought. *HRC v. Smith,* 676 F.2d at 1038–39 & n. 37. The grant of asylum does not, therefore,

---

**33.** Although 8 U.S.C. § 1253(h) prohibits the Attorney General from deporting an alien if he determines that the alien's life or freedom would be jeopardized by returning him to a particular country, this provision does not create a substantive entitlement to asylum, but simply to relief from deportation to that country.

create an interest protected by the due process clause.[34]

■■■ In the absence of a constitutional right, the only procedures to which plaintiffs are entitled are those granted by the statute or the agency. As we have noted, the agency is required to comply with applicable statutory provisions and its own regulations and policy statements. *See, e.g., Accardi,* 347 U.S. at 267, 74 S.Ct. at 503; *HRC v. Smith,* 676 F.2d at 1041 n. 48; *Olegario,* 629 F.2d at 224. Given the statutory mandate instructing the Attorney General to "establish a procedure for an alien physically present in the United States or at a land border or port of entry . . . to apply for asylum," 8 U.S.C. § 1158(a), the *HRC* panel was clearly correct in finding that the statute and its accompanying regulations reflect Congress' "clear intent to grant aliens the right to submit and the opportunity to substantiate their claim for asylum." 676 F.2d at 1038. The question then becomes whether notice of the opportunity to apply for asylum before the district director is clearly mandated by the terms of the Refugee Act.

We conclude that it is not. The Act plainly contains no express statement of such a requirement. Appellees instead base their claim largely on the following statement in a Senate committee report on the Refugee Act:

> The bill requires the Attorney General to establish a uniform procedure for passing upon an asylum application. The Committee believes such a uniform procedure should include a provision allowing all asylum applicants an opportunity to have their claims considered outside a deportation and/or exclusion proceeding, *provided the order to show cause has not been issued.*

S.Rep. No. 256, 96th Cong., 2d Sess. 9 (1980), *reprinted in* 1980 U.S.Code Cong. & Ad.News 141, 149 (emphasis added). Despite appellees' contentions, however, the fact that Congress sought to provide an additional, non-adversarial procedure for hearing asylum requests does not support the conclusion that Congress intended to require notice of the opportunity to petition the district director for asylum. An "order to show cause" is issued by the INS and serves to notify an alien that the deportation process against him has commenced. *See* 8 C.F.R. § 242.1. Congress therefore clearly intended to limit the right to an alternative asylum procedure to the period before the formal deportation or exclusion proceeding has begun. Thus, far from treating the right to petition the district director as a critical part of its asylum scheme, Congress provided that this opportunity should expire within a definite time limit, suggesting that it regarded this procedure as a desirable but by no means essential part of the asylum process. The terms of the applicable regulations are in keeping with this intention, specifying that an alien may file a petition for asylum with the district director when the alien "(1) Is seeking admission to the United States, or; (2) Is in the United States, regardless of his/her status, and has not been placed under exclusion proceedings or served an order to show cause." 8 C.F.R. § 208.3(a).

Because Congress made no direct reference to a notice requirement and the provisions of the applicable regulation appear to accord with the intent that Congress did express, plaintiffs must ultimately fall back on the assertion that a right to notice derives *a fortiori* from the establishment of an asylum procedure. The weakness with this argument is that Congress provides many opportunities to the people of this country without requiring the government to publicize their availability or to take affirmative action to notify possible beneficiaries. It has never been held, for example, that the government must inform individuals that they have the right to sue the government for tort claims, or the right to seek educational loans or public assistance. In addition, requiring mandatory notice of the op-

---

**34.** This conclusion affirms what we stated in note 27, *supra, i.e.* that we disavow any language used by the *HRC* court that might be read to suggest that excludable aliens have constitutional rights under the fifth amendment with regard to their applications for admission, asylum, or parole within this country.

portunity to seek asylum may actually serve to frustrate Congress' intention of preserving aliens with a well-founded fear of persecution in their home countries from repatriation. As one commentator notes:

> [B]lanket notice will also tempt even those without any fear of persecution to latch on to asylum as their last hope....
>
> ....
>
> [T]oo many asylum applications may only bury the truth by straining INS resources and preventing careful assessment of individual claims. If the volume of asylum claims rises significantly, the INS may feel compelled to rely more and more on group profiles and less on individual evidence and credibility.

Note, *Protecting Aliens from Persecution Without Overloading the INS: Should Illegal Aliens Receive Notice of the Right to Apply for Asylum?*, 69 Va.L.Rev. 901, 922, 924 (1983).

We therefore conclude that although aliens have a protected statutory and regulatory right to petition for asylum, neither the Constitution nor the Refugee Act and its accompanying regulations require the INS to inform all potential applicants of their right to seek asylum.[35] Although our reasoning differs somewhat from that employed by the court in *HRC v. Smith,* we reaffirm its conclusion that the existence of this protected right to apply for asylum bars government officials from adopting policies that conflict with the terms of the statute, applicable regulations, and their own announced operating procedures.

## IV. RIGHT OF ACCESS TO DETAINEES

Petitioners also contend that the government has placed extensive restrictions on contacts between outsiders and the Haitian detainees, thereby frustrating the efforts of Haitian Refugee Center (HRC) attorneys to inform them of their legal rights. Plaintiffs originally challenged these restrictions on a number of grounds, but the district court dismissed all of them prior to trial except a first amendment claim. The latter claim was dismissed by the district court after trial on grounds of mootness, since the court's final order released all the Haitians in detention at that time. Plaintiffs challenge the mootness holding and request a determination on the merits.

Since a substantial number of class members are now being held in detention, either because they arrived in this country after the government promulgated its new regulations under the APA or because their parole was revoked after the district court's decision, it is clear that the first amendment claim is not moot. Because the district court did not decide this issue, however, there is no factual record before us, and we conclude that it would be improper for us to reach a decision on the merits. The Supreme Court has repeatedly emphasized that counsel have a first amendment right to inform individuals of their rights, at least when they do so as an exercise of political speech without expectation of remuneration, *see, e.g., In re Primus,* 436 U.S. 412, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978); *NAACP v. Button,* 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); *NAACP v. State ex rel. Patterson,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), but this claim presents a number of questions that require the development of a factual record. We note that the restrictions challenged by plaintiffs do not amount to an absolute denial of access, and the rules involved are not of such a nature that we can strike them down as facially impermissible even without an awareness of possible counter-

---

**35.** The INS' current policy is apparently to inform arriving aliens of their right to seek asylum only if they have questions during their initial interviews with INS officials that "flag asylum claims such as fear of persecution upon being returned...." *Caribbean Migration: Oversight Hearings Before the Subcomm. on Immigration, Refugees and International Law of the House Comm. on the Judiciary,* 96th Cong., 2d Sess. 225 (1980) (statement of David Crosland, Acting Commissioner, INS). Of course, if INS officials were refusing to inform aliens of their right to seek asylum even if they did indicate that they feared persecution if returned to their home countries, our conclusions would be different. This would constitute a clear violation of the Refugee Act, and remedial action would be justified under *HRC v. Smith.*

vailing considerations. Because the regulation of aliens in detention may implicate security concerns similar to those that apply in the prison context, the district court will clearly need to hear evidence on these matters to arrive at the proper balance between the government's interest in security and the HRC's interest in exercising its first amendment rights. We therefore remand this claim to the district court for its consideration in light of the principles set forth above.

## V. CONCLUSION

In summary, we conclude that under well-established Supreme Court precedents excludable aliens such as the Haitian plaintiffs have no constitutional rights with respect to their applications for admission, asylum, or parole. The courts do have authority, however, to review the decisions of executive officials in the immigration area to ensure that they have exercised their discretion in accordance with the applicable statutes, regulations, and the announced policies of their agencies. We emphasize that while it is not the role of the courts to substitute their own judgment for that of executive officials, the courts are not powerless to act when government officials have either failed to exercise their discretion or abused it by acting outside the scope of their delegated authority. Thus, although we conclude that high-level executive officials such as the President and the Attorney General have the authority under the INA to draw distinctions between classes of aliens, discrimination on the basis of national origin by low-level officials in violation of an official executive policy would constitute an abuse of discretion, justifying appropriate remedial action by the courts.

Because we hold that the government's promulgation of regulations under the notice and comment provisions of 5 U.S.C. § 553 to govern the new detention policy has mooted the issue of agency compliance with the APA, we dismiss that part of the appeal and remand with instructions that the injunctive relief grounded on the claimed APA violation be vacated. With regard to those class members currently in detention under the new regulations, the district court should conduct appropriate proceedings to determine whether any relief is necessary in light of the considerations set forth in this opinion. While we reaffirm the holding of the panel in *HRC v. Smith* that the provisions of the Refugee Act of 1980 and its attendant regulations confer a protected statutory and regulatory right to apply for asylum, we conclude that blanket notice of this opportunity to all aliens faced with exclusion or deportation is not mandated by the explicit provisions of the Act, the applicable regulations, or the underlying congressional intent. Finally, we remand to the district court for the development of a factual record the question whether the government's restrictions on access to the Haitian detainees are impermissible under the first amendment.

The complex nature of the questions presented by this case has required detailed consideration, but our ultimate holding is simple and straightforward. Excludable aliens cannot challenge the decisions of executive officials with regard to their applications for admission, asylum, or parole on the basis of the rights guaranteed by the United States Constitution. They do have rights, however, to whatever process Congress—and through its regulations and established policies, the Executive branch—have extended them. Our holding therefore recognizes that while the courts must give proper deference to the plenary power of the political branches to regulate the admission of aliens into our country, the foreigner who comes to our shores with hopes of gaining entry does not stand altogether outside the protection of our laws.

DISMISSED IN PART, REVERSED IN PART, AND REMANDED WITH INSTRUCTIONS.

TJOFLAT, concurring in part and dissenting in part:

I concur in the result of the majority opinion vacating the district court's decision, and in all but part II C of the majority

opinion. I dissent regarding the scope of the review we today authorize the district court to take of the Attorney General's parole policy.

The majority would have the district court determine on remand:

whether the criteria [local immigration officials] employed in making [parole] determinations were consistent with the statutory grant of discretion by Congress, the regulations promulgated by the agencies involved, *and the policies which had been established by the President and the Attorney General.* If the court should find that low-level immigration officials have discriminated on the basis of national origin *despite the adoption of a contrary policy by their superiors in the executive branch,* such conduct would constitute an abuse of discretion that would justify appropriate relief.

Majority opinion at 979 (emphasis added). Insofar as this would require the district court to decide, without consulting the Attorney General himself, how the Attorney General really must have meant to exercise his discretionary parole authority in a particular situation, it casts the district court into an evidentiary quagmire that is not only impractical and unnecessary, but also threatens to destroy the broad discretion Congress granted to the Attorney General in 8 U.S.C. § 1182(d)(5)(A).

We do have the authority to conduct some review of the Attorney General's discretionary decisions regarding parole. *See Mathews v. Diaz,* 426 U.S. 67, 81–2, 96 S.Ct. 1883, 1892, 48 L.Ed.2d 478 (1976); *Kleindienst v. Mandel,* 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972). *See also Bertrand v. Sava,* 684 F.2d 204, 210 (2d Cir. 1982); *Palma v. Verdeyen,* 676 F.2d 100, 105 (4th Cir.1982). However, we undertake a very narrow review of such decisions; the High Court held in *Kleindienst* that "when the Executive exercises this [delegated] power negatively on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against [other interests]." 408 U.S.

at 770, 92 S.Ct. at 2585. In reviewing the Attorney General's decision we might well, for notice reasons, limit his discretionary authority by official policy statements in CFR, but by little else. We respect Congress' broad delegation of power to the Executive in such areas because "any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government [and as such is] largely immune from judicial inquiry or interference." *Harisiades v. Shaughnessy,* 342 U.S. 580, 588–89, 72 S.Ct. 512, 519, 96 L.Ed. 586 (1952) (footnote omitted), quoted in *Mathews, supra* at 81 n. 17, 96 S.Ct. at 1892 n. 17.

The Attorney General has discretion in this area in part to enable him to react flexibly to new situations, and his officers in the field are his eyes and ears in his determination of the best way to exercise his discretion. For this reason, instead of asking the district court to interfere in questions of intra-INS communication and discipline, I would assume the Attorney General to adopt the actions of his officers in the field and ask him to justify them in court, according to our "abuse of discretion" standard, if he wishes to do so. If the field officers have strayed from the Attorney General's wishes, the matter is thus brought to his attention and he can conduct the necessary intra-office discipline. If, as is more likely, the field officers have acted pursuant to policies implicitly, if not expressly, approved by the Attorney General, his decisions will be subject to the requisite narrow judicial review.

The majority implies that the district court will have an easy time in this case determining what the Attorney General's policy on nationality is, without asking him, because a "facially neutral" policy statement on parole exists at 8 CFR 212.5. The policy in CFR is not a comprehensive policy, however. It merely sets out a few specific categories of aliens e.g. pregnant women, those suffering medical emergencies, or certain juveniles, who the district director *gen-*

*erally* should parole in the absence of countervailing security risks. It leaves the weighing necessary to making parole decisions regarding these categories, as well as all other parole decisions, purely in the discretion of the district director. Such a minimal directive is not enough to infer with any certainty that the Attorney General never wants district directors, in making parole decisions, to consider nationality.

In order for the district court to find a "governing policy" on nationality, or specifically on Haitians, it may be necessary for the court to probe extensively into internal office memoranda, oral instructions between supervisors and employees at all levels, and even into intangible intra-office expectancies regarding what is, or what is not, approved conduct. Such an investigation obviously would be impractical in the extreme, and more important, would be totally unnecessary when all this court need do is ask the Attorney General whether he adopts his subordinate's action.

The only issue concerning the court under our narrow standard of review should be whether an action undertaken by the Attorney General, or undertaken by his subordinates and adopted or approved, implicitly or explicitly, by the Attorney General, is outside his broad discretion under 8 U.S.C. § 1182. To that end, the district court on remand should confine itself to asking the Attorney General to justify in the appropriate manner the actions undertaken by him or his department. Otherwise the district court is thrust between the Attorney General and his employees as an interpreter, telling the field officials, in effect, "Your boss did not really mean for you to do X; rather he wants you to do Y." Such a review would limit the Attorney General's discretion by curtailing his ability to react flexibly to changing situations; the district court would constantly be stepping in and reversing field officers' actions unless a paper trail from the Attorney General's office authorized the action. Congress, in granting the Attorney General discretion in parole matters, certainly never intended such an intrusive review; nor can such review be reconciled with the very narrow review of immigration decisions authorized in prior Supreme Court decisions.

KRAVITCH, Circuit Judge, specially concurring in part and dissenting in part with whom JOHNSON, HATCHETT and CLARK, Circuit Judges, join.

I concur in the result for all but Part III.C of the majority's opinion. I write specially as to Part II.B and dissent as to Part III.C.

That Congressional and Executive authority over immigration matters is broad and far reaching is beyond question. Nor is it disputed that aliens seeking entry into this country can claim few constitutional protections regarding their entry. I write specially, however, because I believe that the majority opinion has unnecessarily and incorrectly eroded those few rights to which the courts have determined excludable aliens are entitled under either Congressional statutes or the Constitution.

I.

I initially question, given the majority's treatment of the issues involved as ones concerning abuse of discretion, the opinion's extensive discussion of the constitutional rights of excludable aliens. The majority states that because the INS now has adopted facially neutral criteria for parole, "[t]he question that the district court must therefore consider with regard to the remaining Haitian detainees is thus not whether high level executive branch officials such as the Attorney General have the discretionary authority under the Immigration and Nationality Act [INA] to discriminate between classes of aliens, but whether lower-level INS officials have abused their discretion by discriminating on the basis of national origin in violation of facially neutral instructions from their superiors." *Supra*, at p. 963. Similarly, the majority later notes that "because the government has contended throughout this case that its new detention policy does not discriminate on the basis of national origin, resolution of [whether the executive can discriminate on

the basis of national origin] is not essential to our holding ...." *Supra,* at p. 978.

It is a basic proposition that "prior to reaching any constitutional questions, federal courts must consider non-constitutional grounds for decision." *Gulf Oil Co. v. Bernard,* 452 U.S. 89, 101 S.Ct. 2193, 2199, 68 L.Ed.2d 693 (1981). Here, the majority, in light of the Executive's contention that it was not discriminating and the INS's new facially neutral regulations, has chosen to treat the plaintiffs' claims of discrimination as a non-constitutional contention that low-level INS officials abused their discretion in following the regulations. I do not disagree with the majority that any abuse of discretion questions, as non-constitutional grounds for decision, should have been the first questions addressed. Indeed, the majority is entitled to conclude that the district court and panel erroneously reached the constitutional questions before the non-constitutional ground of abuse of discretion. By choosing that mode of analysis, however, the constitutional powers of Congress or the Executive to discriminate on the basis of national origin in granting parole or the constitutional rights of excludable aliens are not properly before us, and any such discussion by the majority can only be viewed as dicta in deciding future cases.[1]

## II.

I am also unable to agree with the majority's conclusion that "responsible executive officials such as the President or Attorney General possess [the] authority [to discriminate on the basis of national origin] under the INA." *Supra,* at p. 978.[2]

The provisions of 8 U.S.C. § 1182(d)(5) grant the Attorney General the discretion to parole "under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest." The grant of discretionary power, therefore, is facially neutral on the basis of the statute's language. Likewise, the legislative history of the provision centers on non-discriminatory factors, such as reuniting families and medical reasons. That the statute is facially neutral is further evidenced by other statutes in which Congress has given the Executive the power to discriminate on the basis of national origin. For example, in contrast to the parole statute, which contemplates individual consideration based on non-discriminatory factors, 8 U.S.C. § 1182(f) gives the Executive the power to bar entry of "any class of aliens" when "the President finds that the entry of any aliens or any class of aliens into the United States would be detrimental...."[3] Congress thus has shown that it knows how to grant the Executive the authority to discriminate based on national origin where it deems necessary, but no such grant can be found from the language of section 1182(d)(5).

The case that the majority primarily relies upon reaches a similar conclusion as to the nature of the parole statute. The Second Circuit in *Bertrand v. Sava* held:

> Section 1182(d)(5) permits the Attorney General to deny parole to all or to certain groups of unadmitted aliens on the ground that he finds no emergent or public interest reasons justifying their release on parole. The discretion may not be exercised to discriminate invidiously against a particular race or group or to

---

**1.** The case on which the majority primarily relies, *Bertrand v. Sava,* 684 F.2d 204 (2d Cir. 1982), did not reach the constitutional question of due process. *Id.* at 207 n. 6. The court noted that on the facts presented any discrimination that would arguably violate the Fifth Amendment would also constitute an abuse of discretion. The *Bertrand* court, therefore, properly did not reach the due process issue, as it could decide the issue presented on non-constitutional grounds.

**2.** I also question whether the *statutory* power of the Executive to discriminate under 8 U.S.C.

§ 1182(d)(5) is properly before us, as the majority has refined the issue to abuse of discretion by lower-level officials. Because the abuse of discretion question may involve questions of the Executive's statutory authority, however, I feel it necessary to address the majority's reasoning.

**3.** Even the broad powers granted by 8 U.S.C. § 1182(f), however, require that the President find that the entry "be detrimental;" presumably, this finding would have to be legitimate and not merely pretextual.

depart without rational explanation from established policies. *See Wong Wing Hang v. Immigration and Naturalization Service,* 360 F.2d 715, 719 (2d Cir.1966). Such exercise of the power would not be "legitimate and bona fide" within the meaning of *Kleindienst v. Mandel.*

684 F.2d 204, 212 (2d Cir.1982).[4]

The parole statute, therefore, grants the Attorney General wide discretion to deny or grant parole, but the exercise of that discretion must be based upon legitimate and bona fide reasons. To conclude, as the majority does, that the Executive may discriminate under the facially neutral parole provisions of the INA contradicts the principle expressly acknowledged by the majority: where Congress has acted in regulating the admission of aliens, the Executive's power is restricted. *See supra,* at pp. 974–975. *See also INS v. Phinpathya,* —— U.S. ——, 104 S.Ct. 584, 593, 78 L.Ed.2d 401 (1984) (Congress designs the immigration laws); *United States v. Frade,* 709 F.2d 1387 (11th Cir.1983) ("power over immigration matters belongs jointly to the legislature and executive branches, and when exercised by the President, should be in conformity with Congressional intent.") Here, Congress has not given the Executive the power to discriminate in parole decisions based solely on nationality.[5]

Requiring the Attorney General to exercise his discretion based on rational reasons is neither overly burdensome nor unduly restrictive of his powers. Legitimate rea-

sons could necessitate blanket detention of all aliens from a certain country in a crisis situation such as a medical epidemic in the country of origin or for national security reasons. Indeed, in my view, the Attorney General could adopt a policy of denying parole to all aliens, choosing to allow release only for medical or other non-discriminatory reasons.[6] My objection to the majority's reading of the INA is the conclusion that the Attorney General may invidiously discriminate in the granting of parole merely because the Executive decides, without rational reason, that aliens from a certain country should be denied temporary parole.[7]

Nor does such a view create the possibility that the United States would "lose control over our borders." *Supra,* at 975. The scenario that the majority describes of a foreign leader sending over citizens of his country and "compel[ling] us to grant physical admission via parole . . .," *supra,* at 975, is both irrelevant to the holding and unnecessarily alarmist.

First, here we are concerned only with the discriminatory denial of temporary parole prior to deportation or exclusion proceedings; hence, the constitutionality of "indefinite detention" is not properly before us. Second, to the extent pre-deportation parole is relevant, such a de facto invasion envisioned by the majority would present a rational basis for the Attorney General to deny temporary parole. Third, the President has the capability of preventing any such crisis under 8 U.S.C. § 1182(f) (cited

---

**4.** The majority also relies on *Narenji v. Civiletti,* 617 F.2d 745 (D.C.Cir.1979), *cert. denied,* 446 U.S. 957, 100 S.Ct. 2928, 64 L.Ed.2d 815 (1980), for the proposition that the Executive has the power to discriminate against aliens on the basis of nationality. *Supra* at 978 n. 30. The *Narenji* court qualified that power, however, by noting that "[s]o long as such distinctions *are not wholly irrational* they must be sustained." 617 F.2d at 747 (emphasis added). Likewise, the other cases the majority relies on either required a rational reason for the Executive's action, *Nademi v. INS,* 679 F.2d 811, 814 (10th Cir.1982); *Malek-Marzban v. INS,* 653 F.2d 113, 116 (4th Cir.1981), or did not reach the question, *Yassini v. Crosland,* 618 F.2d 1356, 1362 & n. 7 (9th Cir.1980). All these cases also involved the Iranian crisis, thus adding the

President's foreign affairs power to the Executive's reasons for acting.

**5.** The majority's reading would also, of course, allow the Attorney General to deny parole without justifiable reason on the basis of religion, race, gender or economic class.

**6.** The district court found that this policy is in essence that of the present administration. *Louis v. Nelson,* 544 F.Supp. 973, 980–81 (S.D. Fla.1982).

**7.** Because we are dealing with a question of statutory interpretation, I decline to address the equal protection or due process issues that would be raised if the Attorney General adopted new regulations discriminating on the basis of nationality.

by the majority as an example of the Executive's broad powers) and § 1185(a), which gives the President broad powers to act during a national emergency or time of war; moreover, such an "attack" on our borders would likely fall under the Executive's foreign affairs power. Finally, the majority's prime concern—ensuring that excludable aliens could be detained indefinitely *without a justifiable reason* [8]—would extend the holdings of those cases cited by the majority beyond their intended scope and meaning.[9]

### III.

I also disagree with the majority's conclusion that excludable aliens do not have a constitutional right to be notified of their protected right to apply for asylum.

The predecessor of this court in *HRC v. Smith,* 676 F.2d 1023 (5th Cir. Unit B 1982),[10] held that it was Congress' "clear intent to grant aliens *the right to submit and the opportunity to substantiate* their claim for asylum." *Id.* at 1038 (emphasis added). The *Smith* court found that although aliens do not have a substantive entitlement to asylum, the Refugee Act of 1980 does create "at a minimum a constitutionally protected right to petition our government for political asylum." *Id.* The majority's opinion does not disavow these basic holdings in *Smith. Supra,* at 981–983, 983.

The question then becomes whether "the right to submit and the opportunity to substantiate" a claim for asylum includes the right of an alien to be notified that he has such a right in the first place. The majority concludes that no right to notice exists because it is not expressly mentioned in the pertinent statutes or regulations and because no right to notice has been found for other congressionally created opportunities, such as the availability of educational loans and public assistance. *Supra,* at 984–985.

I find such reasoning unpersuasive because it ignores the reality of the situation before us and frustrates Congress' intent in passing the Refugee Act of 1980. The Refugee Act was enacted to give "statutory meaning to our national commitment to human rights and humanitarian concerns." S.Rep. No. 96–256, 96th Cong., 2d Sess. 1, *reprinted in* 1980 U.S.Cong. & Adm.News 141. Those aliens to which Congress intended the Act to apply will frequently arrive on our shores ignorant of our legal system and unschooled in our language. If the Act truly is to have "meaning," and the constitutionally protected right to petition for asylum recognized by the *Smith* court is to have any substance, these individuals must be informed that the procedures and

---

**8.** If the aliens in question posed a risk to society or national security, or created other problems necessitating detention, such dangers would of course provide a rational reason for the Executive to continue detention. Because the majority's scenario poses a situation where no legitimate reason for further detention exists, we must assume that they are concerned with the Executive's power to detain excludable aliens who could not otherwise be detained except for their status as excludable aliens.

**9.** It is worth noting that in *Shaughnessy v. United States ex rel Mezei,* 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953), the alien involved posed a security risk; a factor which the Supreme Court not only found to be important, but also a distinguishing factor from normal parole proceedings:

It is true that resident aliens temporarily detained pending expeditious consummation of deportation proceedings may be released on

bond by the Attorney General whose discretion is subject to judicial review. *Carlson v. Landen,* 1952, 342 U.S. 524 [72 S.Ct. 525, 96 L.Ed. 547]. By that procedure aliens uprooted from our midst may rejoin the community until the government effects their leave. *An exclusion proceeding grounded on danger to the national security, however, presents different considerations;* neither the rationale nor the statutory authority for such release exists.

345 U.S. at 215–16, 73 S.Ct. at 630–31 (emphasis added).

As the majority notes, there are also other factual differences that distinguish *Mezei* from the questions presented here. *See supra* at 965 n. 6.

**10.** This circuit has adopted as binding precedent all decisions of former Fifth Circuit Unit B. *Stein v. Reynolds Securities Inc.,* 667 F.2d 33 (11th Cir.1981).

rights provided by the Act are available to them. To hold otherwise is to effectively negate Congress' effort to provide aliens a meaningful opportunity to present legitimate claims for asylum.[11]

Because notice is an inseparable part of the constitutionally protected right to petition for asylum under the Refugee Act, and because notice would effectuate Congress' intent, I would hold that the due process protections accorded by the *Smith* court encompass the right to notice.

11. The majority suggests that if all aliens were given notice, the danger exists that legitimate claims would be overshadowed by frivolous claims. *Supra* at 984. Certainly, if aliens are not notified of their right to petition for asylum there will be fewer claims, as the aliens will not be aware that such a right exists. The problem with the majority's solution for weeding out frivolous claims is that it also leads to the loss of the right to petition by aliens with legitimate claims, thus effectively emasculating the very rights that Congress intended to create.